# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RAMANJEET KAUR, KULWINDER SINGH UPPAL, and NEW ENGLAND DISTRIBUTORS, INC., | CIVIL ACTION NO. 1:19-cv-11364-WGY |
| Plaintiffs, | |
| v. | |
| WORLD BUSINESS LENDERS, LLC, WBL SPO I, LLC, AXOS BANK, and ATLANTIS CAPITAL, LLC, | |
| Defendants. | |

## PLAINTIFFS' OPPOSITION TO THE MOTION TO DISMISS BY DEFENDANTS WORLD BUSINESS LENDERS, LLC, WBL SPO I, LLC, AND AXOS BANK

Shane R. Heskin (BBO #665098)
Rachel J. Eisenhaure (BBO #663876)
WHITE AND WILLIAMS LLP
101 Arch Street, Suite 1930
Boston, MA 02110
T:  (617) 748-5200
F:  (617) 784-5201
heskins@whiteandwilliams.com
eisenhaurer@whiteandwilliams.com

*Attorneys for Ramanjeet Kaur, Kulwinder Singh Uppal, and New England Distributors, Inc.*

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Ashcroft v. Iqbal*,
556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ................................................11, 12

*BankWest, Inc. v. Oxendine*,
266 Ga. App. 771 (App. Ct. Ga. 2004) ......................................................................................9

*Begelfer v. Nagarian*,
381 Mass. 177 (1980) ..............................................................................................................14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................................................................................11

*CashCall, Inc. v. Morrisey*,
2014 WL 2404300 (W. Va. May 30, 2014) .........................................................................8, 10

*Commonwealth v. Fremont Inv. & Loan*,
2008 Mass. Super. LEXIS 46, 23 Mass. ..................................................................................16

*Commonwealth v. Fremont Inv. & Loan*,
452 Mass. 733 (2008) ...............................................................................................16, 17, 18

*Commonwealth v. H&R Block, Inc.*,
2008 Mass. Super. LEXIS 427 (Nov. 25, 2008) .........................................................17, 18, 19

*Consumer Fin. Prot. Bureau v. CashCall, Inc.*,
2016 U.S. Dist. LEXIS 130584 (C,D, Ca. Aug. 31, 2016) ...................................................8, 10

*Dandy v. Wilmington Fin., Inc.*,
2010 WL 11493721 (D.C.N.M. May 3, 2010) ..........................................................................8

*Drakopouluos v. United States Bank Nat'l Ass'n*,
465 Mass. 775 (2013) ..............................................................................................................17

*Eastern v. American West Financial*,
381 F.3d 948 (9th Cir. 2004) .....................................................................................................9

*Frappier v. Countrywide Home Loans, Inc.*,
645 F.3d 51 (1st Cir. 2011) ......................................................................................................17

*Ga. Cash Am. v. Greene*,
734 S.E.2d 67 (Ga. App. 2012) .................................................................................................8

*Giragosian v. Ryan,*
  547 F.3d 59(1st Cir. 2008) ...................................................................................3

*In re Grandoit,*
  2014 U.S. Dist. LEXIS 102507, 2014 WL 3749188 (D. Mass. 2014) ...................................11

*In re Hayes,*
  393 B.R. 259 (Bankr. D. Mass. 2008) ...................................................................14

*In re Stone St. Capital, LLC,*
  2013 Mass. Super. LEXIS 45 (Mass. Super. Ct. 2013) ............................................9

*Krispin v. May Department Stores,*
  218 F.3d 919 (8th Cir. 2000) ...........................................................................9, 10

*Meade v. Marlette Funding,*
  2018 Colo. Dist. LEXIS 1183 (Colo. D. Ct. Aug. 13, 2018)........................................8, 10, 11

*Meade v. Marlette Funding LLC,*
  2018 U.S. Dist. LEXIS 46814 (D. Col. Mar. 21, 2018) ............................................10

*Moronta v. Nationstar Mortgage, LLC,*
  88 Mass. App. Ct. 621 (2015)............................................................................17, 19

*Pennsylvania v. Think Fin., Inc.,*
  2016 U.S. Dist. LEXIS 4649 (E.D. Pa. Jan. 14, 2016) ............................................10

*Pennsylvania v. Think Finance, Inc.,*
  2016 WL 183289 (E.D. Pa. 2016) ....................................................................8, 10

*People ex rel. Spitzer v. Cty. Bank of Rehoboth Beach, Del.,*
  45 A.D.3d 1136, 846 N.Y.S.2d 436 (N.Y. App. Div. 2007) ......................................8, 10

*Phillips v. Equity Residential Management, L.L.C.,*
  478 Mass. 251 (2017) .....................................................................................14

*Sawyer v. Bill Me Later, Inc.,*
  23 F. Supp. 3d 1359 (D. Utah 2014)..................................................................10

*Sylvester v. Swan,*
  87 Mass. (5 Allen) 134 (1862)..........................................................................9

*Ubaldi v. SLM Corp.,*
  852 F. Supp. 2d 1190 (N.D. Cal. 2012) ...........................................................8, 10

**STATUTES**

G. L. c. 183C, § 2..............................................................................................16

M. G. L. c. 271, § 49 ...................................................................................................................13

Mass. Gen. Laws c. 93A, § 2(a) ......................................................................................................1

**OTHER AUTHORITIES**

Hannon, J., *The True Lender Doctrine: Function Over Form as a Reasonable Constraint on the Exportation of Interest Rates,* Duke Law Journal, Vol. 67:1261, 1285 (2018) ..........................................................................................................12

http://oag.dc.gov/release/cashcall-agrees-provide-nearly-3-million-refunds-and-debt-forgiveness-district-consumers ........................................................................................7

http://www.ag.ny.gov/press-release/ag-schneiderman-announces-settlement-western-sky-financial-and-cashcall-illegal-loans .....................................................................7

https://www.bloomberg.com/graphics/2018-confessions-of-judgment/ .......................................15

23428824v.1

## **INTRODUCTION**

This case stands at the intersection of two dangerous trends in the marketing of financial products: (1) placing a home at risk by issuing a financial product doomed to fail; and (2) "rent-a-bank" or "rent-a-charter" schemes in which the identity of the true lender is obscured, and a loan placed in the name of a federally chartered bank, as a dodge around state usury laws or other state law requirements.

First, since the subprime mortgage crisis fifteen years ago, courts have been dealing with the fallout of mortgages on homes backing loans that were inadequately underwritten and doomed to fail.  Regulations have been adopted to protect residential mortgagors, but those regulations can be avoided where a loan is designated a business loan.  But framing the loan as a "business loan" cannot exempt these lenders from the scope of Chapter 93A.  It is an unfair and deceptive practice to offer Massachusetts residents such as the plaintiffs the opportunity to get capital to build their businesses if the loans have an unreasonable risk of failure.  It is an unfair and deceptive practice to ask Massachusetts residents to put up their homes as collateral for a financial product that lenders have not adequately underwritten.  Mass. Gen. Laws c. 93A, § 2(a) makes it unlawful to engage in any unfair methods of competition and unfair and deceptive acts or practices in the conduct of any trade or commerce in the Commonwealth.   Settled Massachusetts law provides that loans that are doomed to fail, loans with inadequate underwriting, violate Chapter 93A.  These principles continue to apply when the funds are borrowed in the name of a small business where the owners must back the loan with mortgage on their home and their personal guaranty.

This case also implicates a second dangerous trend in financial product marketing: what courts around the country have begun to call "rent-a-bank" or "rent-a-charter" schemes.  Such a

scheme obscures the identity of the true lender, naming instead a federally chartered bank in the papers, as a dodge around state usury laws.  Usury is in resurgence following the financial crisis, and Congress recently heard testimony that "the presumption that business to business transactions take place between sophisticated parties on equal footing… is clearly an erroneous presumption."[1]  The loan here, on its face a business loan, requiring substantial daily payments acknowledged to be equivalent to 92% APR, is backed by personal guaranty and a mortgage on a home.  Transactions of this structure have been a proprietary product of World Business Lenders, LLC ("WBL") – an alternative finance company that provides short term high interest loans backed by personal guarantees and real estate collateral – since its inception.  All the forms used for this transaction are demonstrably WBL forms.  Nonetheless, the transaction documents all attempt to position BOFI (now Axos) as the lender.  Axos is a federal bank organized under the laws of Nevada – a state that has no usury laws.  Structuring a loan in the name of a federal bank is a common scheme that alternative lenders use to take advantage of the legal exemptions for federally chartered banks that otherwise would not be applicable to alternative lenders such as WBL.  Such a scheme is referred to as a "rent-a-bank" or "rent-a-charter" scheme because the alternative finance company is the true lender while the bank receives a fee for the use of its name and charter, but bears no real risk.

## BACKGROUND

Plaintiffs received a 92% APR business loan backed by a mortgage on their family home.  Although the loan purported to be from a national bank, WBL is the true lender here.

---

[1] *See* Exhibit H, p. 3, Prepared Statement of Hosea H. Harvey, Ph.D.

23428824v.1

<u>Initiation of the Transaction</u>

In March 2018, Ramanjeet Kaur and her husband Kulwinder Singh sought financing for their small business, New England Distributors, Inc.  ¶¶ 22-23.[2]  The only financial information the broker gathered from the plaintiffs were the last four months of business bank statements and merchant processing statements, and the company's outstanding business debt. ¶ 25.  The broker asked them to fill out a "Uniform Residential Loan Application." ¶ 26.  Exhibit A, attached.[3]

Ms. Kaur was confused by the "Uniform Residential Loan Application," and wrote to the broker:

> Hello Alan it's Ramanjeet kulwinder' S wife I want to make sure is this loan on Bussiness or that's on property Because kulwinder told me they just need this property as a guarantor but nothing going on my name or property loan is on New England name please make first what kind of loan is that [sic] ¶ 27.

The broker responded:

> Your husband is absolutely right.This is a business loan going to New England Distributor.But lender is taking your house as collateral for guarantee.Daily payback amonut will be deducted from New England's account also. [sic]  ¶ 28.

The broker introduced Ms. Kaur and Mr. Uppal to World Business Lenders, which agreed to provide financing for New England Distributors.  ¶ 29.  For its underwriting process, World Business Lenders required six months of bank statements from New England Distributors, and a brief video interview.  ¶ 30.  While Ms. Kaur and Mr. Uppal were told that World Business Lenders could request additional documents during the underwriting process, no additional documents relating to the New England Distributors financials were requested. ¶ 31.  The World Business Lenders transaction presented to Ms. Kaur and Mr. Uppal was a 92% APR loan.  ¶ 33.

---

[2] Paragraph references refer to the Complaint and Demand For Trial by Jury.

[3] In reviewing a Motion to Dismiss, the Court may appropriately consider documents incorporated by reference in the complaint, matters of public record, and other matters susceptible to judicial notice.  *Giragosian v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008).  All attachments to this opposition are either documents incorporated by reference in the complaint, or are publicly available documents.

Ms. Kaur and Mr. Uppal each submitted a Business Loan Application (attached hereto as Exhibit B) containing letterhead of both World Business Lenders, LLC and BOFI. ¶ 34.  Those applications are On the Business Loan Application, Plaintiffs left many blanks, including whether the company had employees and whether the business location was owned or rented.  ¶ 36.  The Business Loan Application stated "Depending upon various factors, loans will be made by either World Business Lenders ("WBL") or BofI Federal Bank ("BofI"), Member FDIC."  ¶ 37.  Nonetheless, other disclosures made clear that WBL, and not BofI, would do the groundwork: "I will promptly notify WBL of any material changes…" and "WBL may order a valuation to determine the value of property proposed as collateral…".  ¶ 38.

On March 14, 2018, Plaintiffs were sent a loan ("the Loan"), backed by a personal guaranty ("the Guaranty"), and secured by a mortgage on the plaintiffs' family home.  ¶ 40. The Business Loan Summary indicated that a Loan Amount of $175,000, a daily Interest Rate of .250136986301%, and an APR of 92.5687%.  ¶ 43. The Business Loan Summary set forth a payment schedule that 188 payments of $1,277.82 would be due each business day between 3/19/2018 and 12/13/2018.  ¶ 44.  The total repayment required under the Loan was $241,506.95, meaning that plaintiffs would pay an interest charge of $66,506.95 on a $175,000 loan held for just under nine months.  ¶ 45.

<u>Funding and Payment</u>

On March 16, 2018, plaintiffs' business bank account received an electronic deposit of $172,237.50 from an account titled "CCD DEPOSIT, BOFI FEDERAL BAN EPAY0001." ¶¶ 51-52.  The first $1,277.82 electronic withdrawal, on March 19, 2018, was noted as "CCD DEBIT, BOFI AUTOPAY." ¶ 55.  All later withdrawals were ascribed to WBL. ¶¶ 56-58.

<u>WBL and BOFI's Respective Business Models</u>

The type of transaction at issue here – a loan backed by real estate security – is one that WBL has specialized in since its inception. ¶¶ 74-90. In fact, as World Business Lenders' sales manager David Rabouin stated, "We're an asset based lender." and "All of our loans are secured with real estate." ¶ 77. The WBL website expressly advertises this product. ¶ 83. The Axos website does not advertise such products. ¶¶ 61-73.

<u>WBL Created the Forms for this Transaction</u>

The "Business Promissory Note and Security Agreement" signed by Ms. Kaur on behalf of New England Distributors Inc. is a form created by WBL. ¶ 94. WBL has been using earlier versions of the same "Business Promissory Note and Security Agreement" since at least as far back as 2014. ¶ 95. The forms used for this transaction have been used for other, similar transactions in which WBL participated with other banks standing in the place of Axos. ¶¶ 96-127. The contracts for this agreement are attached hereto as Exhibit C. Copies of the parallel forms WBL has used with other banks, discussed at ¶¶ 96-127, are attached hereto as Exhibit D.

## **ARGUMENT**

To assist the Court, this argument follows the order of the argument sections in the motion to dismiss.

### **I. Whether Axos is Subject to the Usury Laws is Irrelevant**

Defendants start by choosing a field on which it is easy for them to prevail: Axos, as a federally chartered bank, is not subject to state usury laws. Plaintiffs do not disagree.

The issue, rather, is whether a loan that is *not* from Axos, but from WBL, is subject to state usury laws (it is) and whether plaintiffs have alleged sufficient facts to establish that the loan is from WBL and not Axos (they have). The claims here are not that Axos made a loan that

it could not have made, but that WBL made a loan it could not have made, and it did so by buying the use of Axos's name, which did not have the legal effect of endowing WBL with the rights and privileges of Axos or its immunity from Massachusetts usury law.

Defendants' preemption arguments under HOLA also fail. Axos is not the true lender; there is no preemption.

## II. Whether WBL is the Lender is the Real Question; The Forms Suggest It Is.

Defendants' two objections to the rent-a-bank theory of liability are legal and factual: first, that the "true lender" doctrine is not recognized in Massachusetts and, second, that the allegations are insufficient to state a claim.

## A. The True Lender Doctrine is Accepted Massachusetts Law.

In 2015, the Commonwealth of Massachusetts, by and through its Attorney General, brought an action to shut down a similar scheme where a lender on tribal land and subject to tribal law (Western Sky) entered into an agreement to sell its loans to CashCall. On October 6, 2015, the Massachusetts' Attorney General filed a complaint (Exhibit E, attached) in Superior Court alleging that Western Sky and CashCall were victimizing Massachusetts consumers by unfairly and deceptively charging interest in excess of Massachusetts' usury laws.

In response, Western Sky and CashCall asserted that they were not subject to the regulators' jurisdiction because the loans were provided through Western Sky, which was located on the Cheyenne River Indian Reservation in South Dakota, and therefore had tribal immunity from state and federal banking laws. The defendants argued that the rates charged were permissible under tribal law. Their argument was rejected by the trial court. After losing their jurisdictional arguments, the defendants settled the lawsuit with the Massachusetts Attorney General. The settlement included a permanent injunction where the lenders agreed to no longer

do business in the Commonwealth and provide $17 million in refunds and loan modifications for their victims.  The Undersecretary of the Office of Consumer Affairs and Business Regulation, John C. Chapman, commented: "[a]ny businesses attempting to avoid the licensing and usury laws of the Commonwealth at the expense of Massachusetts consumers will not be tolerated.  This settlement is a victory for the thousands of Massachusetts consumers who took out Western Sky loans and serves as a warning to unlicensed lenders." See Exhibit F, attached.[4]

In her letter to the FDIC on January 22, 2019, Maura Healey and *nine other state attorneys general* decried rent-a-bank schemes because they are "legally flawed."  Ex. G:

> A number of recent decisions have cast doubt on the legality of tribal lending schemes.[16] As a result, payday lenders are once again turning to "rent-a-bank" schemes in order to evade state law. Recent court decisions, however, suggest that "rent-a-bank" schemes are just as legally flawed as tribal lending schemes.[17] State-chartered banks should be wary of entering into relationships with fringe lenders that are structured to evade state rate caps. **We recommend that the FDIC discourage banks from entering into these relationships in any guidance it issues on small-dollar lending.**

In support of her position, Maura Healey cited the following authority:

[16] *See, e.g., CFPB v. CashCall, Inc., 2016 WL 4820635*, at *6 (C.D. Cal., Aug. 31, 2016) (holding that defendant payday lender was the "true lender" and real party in interest in tribal lending scheme); *MacDonald v. CashCall, Inc.*, 2017 WL 1536427, at *3 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018) (detailing recent trend of cases in favor of parties challenging tribal lending arrangements across the country).

[17] *See*, e.g., *Think Finance*, *supra* note 14 (denying motion to dismiss and finding that state's allegations that non-banks were utilizing a "rent-a-bank" scheme to circumvent state usury laws were sufficient to state a plausible claim for relief and not preempted); *CashCall, Inc. v. Morrisey*, 2014 WL 2404300 (W. Va. May 30, 2014) (not published), *cert. denied*, __ U.S. __, 135 S.Ct. 2050 (2015) (holding that substance governs over form in evaluating "true lender" in a "rent-a-bank" scheme); *Meade v. Marlette Funding*, No. 2017CV30377 (Colo. Dist. Ct. Aug. 13, 2018) (order denying non-bank defendant's motion to dismiss on preemption of applicable Colorado rate caps).

---

[4] The State of New York has also cracked down on such rent-a-bank schemes in obtaining similar results against Western Sky Financial, LLC, Cash Call, Inc. WS Funding, LLC and their owners. *See* http://www.ag.ny.gov/press-release/ag-schneiderman-announces-settlement-western-sky-financial-and-cashcall-illegal-loans. So has the District of Columbia.  *See* http://oag.dc.gov/release/cashcall-agrees-provide-nearly-3-million-refunds-and-debt-forgiveness-district-consumers.

Ms. Healey's position is also supported by the vast majority of courts dealing with rent-a-bank or rent-a-tribe schemes. *See Meade v. Marlette Funding*, 2018 Colo. Dist. LEXIS 1183 (Colo. D. Ct. Aug. 13, 2018); *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 U.S. Dist. LEXIS 130584, *1 (C,D, Ca. Aug. 31, 2016) ("The key and most determinative factor is whether Western Sky placed its own money at risk at any time during the transactions, or whether the entire monetary burden and risk of the loan program was borne by CashCall.") ("Based on the totality of the circumstances, the Court concludes that CashCall, not Western Sky, was the true lender."); *Pennsylvania v. Think Finance, Inc.*, 2016 WL 183289, *1 (E.D. Pa. 2016) (applying predominant economic interest test); *CashCall, Inc. v. Morrisey*, 2014 W. Va. LEXIS 587, *46-47 (W. Va. Ct. App. May 30, 2014 (looking at the substance, not form, of the transaction to determine if the loan was usurious); *Ubaldi v. SLM Corp*., 852 F. Supp. 2d 1190, 1196 (N.D. Cal. 2012) ("[W]here a plaintiff has alleged that a national bank is the lender in name only, courts have generally looked to the real nature of the loan to determine whether a non-bank entity is the de facto lender"); *Ga. Cash Am. v. Greene*, 734 S.E.2d 67, 74-75 (Ga. App. 2012) (same); *Dandy v. Wilmington Fin., Inc*., 2010 WL 11493721, *8 n.8 (D.C.N.M. May 3, 2010) ("Plaintiff has come forward with significant evidence to rebut [d]efendant's claim [that it was not the true lender], including evidence of loan documents showing [defendant] as the lender, as well as evidence that [defendant] underwrote and made decisions on all loans, performed all origination services, agreed to hold solely in its own name any loan that could not be assigned on the secondary market, and funded all loans from an account that it alone owned and controlled."); *People ex rel. Spitzer v. Cty. Bank of Rehoboth Beach, Del.*, 45 A.D.3d 1136, 846 N.Y.S.2d 436, 439 (N.Y. App. Div. 2007) ("It strikes us that we must look to the reality of the arrangement and not the written characterization that the parties seek to give it, much like Frank

Lloyd Wright's aphorism that 'form follows function.'"); *Eastern v. American West Financial*, 381 F.3d 948, 957 (9th Cir. 2004) ("[T]he touchstone for decision here is whether licensed or unlicensed parties were placing their own money at risk at any time during the transactions."); *BankWest, Inc. v. Oxendine*, 266 Ga. App. 771 (App. Ct. Ga. 2004) (courts must "critically examine the substance of the transaction, regardless of the name given it . . . the theory that a contract will be usurious or not according to the kind of paper bag it is put up in, or according to the more or less ingenious phrases made use of in negotiating it, is altogether erroneous.").

This concept of placing substance over form is also long supported under Massachusetts law. *See Sylvester v. Swan*, 87 Mass. (5 Allen) 134 (1862) ("Whatever form or disguise the dealing of the parties may assume, it will be deemed usurious if in effect it is a loan of money at an unlawful rate of interest."); *Hopkins*, 256 Mass. at 372 ("[N]o device intended to cover up the real character of the transaction can ever avail to defeat the [usury] statute."); *In re Stone St. Capital, LLC*, 2013 Mass. Super. LEXIS 45, *11-12 (Mass. Super. Ct. 2013) ("The usury statute applies if in economic reality a transaction involves a loan of money, even if the parties conceived of or tried to arrange their deal as something other than a loan.").

Like other rent-a-bank advocates, Defendants rely upon *Krispin v. May Department Stores*, 218 F.3d 919, 924 (8th Cir. 2000) for their assertion that courts should only look to form, not substance. The *Krispin* decision, however, has been widely distinguished because, unlike here, the parties were closely related corporate affiliates. In addition, the majority of courts have refused to follow *Krispin*:

> Further, if we were to apply the [test] as CashCall advocates, we would always find that a rent-a-bank was the true lender of loans such as those at issue in this case.... As for the two cases on which CashCall relies, *Vaden* and *Krispen,* they are easily distinguishable from the instant case because, in both cases, the non-bank entity was a corporate affiliate of the bank. In contrast, CashCall and [the bank] are completely separate entities, or, as the circuit court noted, "independent

-9-

> contractors to each other in performing their respective obligations [under the agreement]."

*CashCall, Inc. v. Morrisey*, 2014 WL 2404300 (W. Va. May 30, 2014); *Think Finance*, 2016 U.S. Dist. LEXIS 4649, *40-41 ("Other courts have noted that the close relationship between the bank and the store made *Krispin* a unique situation."); *Ubaldi v. SLM Corp.*, 852 F.Supp.2d 1190, 1200 (N.D. Cal. 2012) (highlighting the language in *Krispin*: "in these circumstances").

Defendants also rely upon *Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359 (D. Utah 2014). *Sawyer* is the proverbial outlier. *See Pennsylvania v. Think Fin., Inc.*, 2016 U.S. Dist. LEXIS 4649, *40 (E.D. Pa. Jan. 14, 2016) (rejecting *Sawyer* because the Third Circuit "distinguishes between claims against banks and claims against non-banks for purposes of preemption."); *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 U.S. Dist. LEXIS 130584, *16 (C.D. Cal. Aug. 31, 2016) (rejecting *Sawyer* and applying "the 'predominant economic interest,' which examines which party or entity has the predominant economic interest in the transaction."); *Meade v. Marlette Funding LLC*, 2018 U.S. Dist. LEXIS 46814, *10 (D. Col. Mar. 21, 2018) (distinguishing *Sawyer* and applying true lender test to preemption claim).

In rejecting *Sawyer*, the *Meade* court cited a nearly identical rent-a-bank scheme in *Matter of People of State of New York v. County Bank of Rehoboth Beach, Del.*, 846 N.Y.S.2d 436, 437 (3d Dep't 2007). In *Rehoboth*, the trial court granted summary judgment to the non-bank because it was undisputed that the bank independently made "the decision to extend credit, the extension of such credit and the disbursal of the proceeds of the loan." The Appellate Division reversed, explaining that:

> we must look to the reality of the arrangement and not the written characterization that the parties seek to give it, much like Frank Lloyd Wright's aphorism that "form follows function." Thus, an examination of the totality of the circumstances surrounding this type of business association must be used to determine who is

the "true lender," with the key factor being "who had the predominant economic interest" in the transactions.

**B.     The Allegations Here State Such a Claim.**

To survive defendants' motion to dismiss, plaintiffs' burden is to state "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A complaint is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). This requires a two-pronged approach: (1) identify the factual allegations; and 2) assess whether those allegations allow the court to draw reasonable inference that the defendant is liable for the misconduct alleged. *See, e.g., In re Grandoit,* 2014 U.S. Dist. LEXIS 102507, *5, 2014 WL 3749188 (D. Mass. 2014).

As discussed above, courts look to the substance, not form, of a transaction in identifying the true lender.  "In identifying the true or de facto lender, courts generally consider the totality of the circumstances and apply a 'predominant economic interest,' which examines which party or entity has the predominant economic interest in the transaction. The key and most determinative factor is whether [the bank party] placed its own money at risk at any time during the transactions, or whether the entire monetary burden and risk of the loan program was borne by [the non-bank]."  *Meade v. Funding*, 2018 Colo. Dist. LEXIS 1183, *44-45 (2018), *quoting Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635 (C.D. Cal., Aug. 31, 2016).

Here, the facts are these:

- The product has terms that are in line with what WBL advertises and not what Axos advertises. ¶¶ 63-73, 77-111.

- WBL's representatives have made public statements that they offer this kind of product, even describing it as "proprietary." ¶¶ 89-90.

- Although the funding and the first withdrawal came from accounts with names suggesting an Axos link, all remaining withdrawals came from accounts with names linked to WBL.  ¶¶ 51-58.

- The forms used in the loan are obviously from the same model form WBL has used with other bank partners to in similar transactions. ¶¶ 94-127.

Under the *Iqbal* standard, these facts permit a reasonable inference that WBL is the true lender.  The forms are clearly WBL's forms. Although defendants claim that the similarities in the forms are "entirely unsurprising," the similarities go beyond common banking inquiries:  the human eye can easily see that they are produced from versions of the same form document.  The overall look and feel of the formatting permit a reasonable inference that these documents came from the same form bank.  The use of WBL's forms suggests that this loan is an example of the real estate-backed loan products that WBL advertises on its website and that WBL's representatives have referred to as its proprietary model.  This product is WBL's raison d'être, and the keystone of its business model.  That, and its divergence from what Axos otherwise offers as financial products, suggests that WBL bears the financial risk in the transaction.

It is telling that the defendants will not simply admit that these are WBL-created forms. It is human nature that the decision makers at the entity bearing the financial risk would push to use forms created and vetted by their own organization.

This inference is furthered by the fact that, after the first withdrawal, all withdrawals were associated with accounts whose labels suggested a WBL affiliation.  That the funding and first withdrawal came from a BOFI-labeled account is not to the contrary.  In fact, the Western Sky complaint, brought by the Massachusetts Attorney General (Exhibit E, ¶44(b)), shows that rent-a-bank schemes have in the past set up structures to make the funding appear to come from the named bank.  *See also* Hannon, J., *The True Lender Doctrine: Function Over Form as a Reasonable Constraint on the Exportation of Interest Rates,* Duke Law Journal, Vol. 67:1261,

1285 (2018) ("[R]ent-a-charter participants are likely to seize on factors identified by courts applying the true lender doctrine and subsequently attempt to structure the form of their relationships so as to avoid the appearance of sham transactions."). Thus the initial funding and first withdrawal cannot immunize WBL from true lender status. The legal question is who has the predominant economic interest, i.e. who bears the the risk in a transaction. The name of the funding account shows only that the money came from a BOFI funding account; it does not show whether BOFI bore the risk. It does not show where the money came from before it was in the BOFI-labeled account, or whether other arrangements transferred the risk of the transaction from BOFI to WBL before the transaction was even complete.

In sum, the claim is plausible and the plaintiffs' claim should proceed.

### III. ONCE WBL IS ESTABLISHED AS THE LENDER, THE LOANS ARE USURIOUS.

As noted above, WBL is not a federal bank like Axos. WBL is not inherently entitled to exemption from the Massachusetts usury statute, M. G. L. c. 271, § 49.

WBL claims that it is entitled to charge interest above the 20% usury rate because it has declared its intent to do so to the Attorney General in accordance with M. G. L. c. 271, § 49(d). That provision begins: "The provisions of paragraph (a) to (c), inclusive, shall not apply to any person who notifies the attorney general of his intent to engage in a transaction or transactions which, but for the provisions of this paragraph, would be proscribed under the provisions of paragraph (a) **providing any such person maintains records of any such transaction**." M. G. L. c. 271, § 49(d) (emphasis added). The exemption is expressly subject to this limitation: the lender must keep accurate records.

WBL argues that the required records are limited to those enumerated a few sentences later: "Such records shall contain the name and address of the borrower, the amount borrowed,

the interest and expenses to be paid by the borrower, the date the loan is made and the date or dates on which any payment is due." That the legislature did not think to include that one could not misrepresent the identity of the lender in the records of a transaction does not undercut the more general record-keeping requirement of the statute. "[A] statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Phillips v. Equity Residential Management, L.L.C.*, 478 Mass. 251, 257 (2017), *quoting Board of Educ. v. Assessor of Worcester*, 368 Mass. 511, 513, 333 N.E.2d 450 (1975). The usury law was enacted to address oppressive lending practices, of which rent-a-bank schemes are a current iteration. *See Begelfer v. Nagarian*, 381 Mass. 177, 182 (1980) (discussing enactment of usury statute).

Assuming that WBL is proven the true lender here: WBL has not kept accurate records of the plaintiffs' indebtedness to WBL because WBL claims that the plaintiffs' loan came from Axos. That inaccuracy is a meaningful one. Loan holders are entitled to know whom they owe money. *See, e.g., In re Hayes*, 393 B.R. 259, 268 (Bankr. D. Mass. 2008), *quoting In re Schwartz,* 366 B.R. 265, 266 (Bankr. D. Mass. 2007) ("[I]t is often difficult for unsophisticated borrowers to be certain of the identity of their lenders and mortgagees."). *Compare* Exhibit E, ¶ 40 (allegation in AG's Western Sky complaint that borrowers given false information regarding application of Massachusetts law, based on false identification of lender). Lender identity is a meaningful part of recording a debt and obscuring it through a rent-a-bank scheme renders the records inaccurate even if the accounting of the indebtedness is otherwise correct. Lender allows borrowers to understand their rights and know against whom their recourse lies, particularly

-14-

where not all lenders are subject to the same rules.  Defendants' own briefing shows as much, noting that certain defenses arise from Axos's status as a federal bank that WBL does not share. The identity of the lender is meaningful to borrowers' understandings of their rights and remedies; obscuring that identity necessarily impairs that understanding and has a chilling effect on their ability to seek redress.

Consider also the impact of defendants' position on the Attorney General's oversight role.  The purpose of the § 49(d) letter is to allow the AG to audit, if necessary, the records of loans made pursuant to that exception.  If the AG approached WBL and asked for the records of the loans it made in excess of 20%, records of the loan here would not be produced: WBL would rely on the fiction that Axos was the lender.  Thus for Axos-labeled loans where WBL is the true lender, any records WBL maintains are not immunized by the letter submitted pursuant to § 49(d) precisely because WBL falsely positions those as Axos loans.

This also relates directly back to the broader legislative purpose of protecting against loansharking:  the current crisis of oppressive lending is occurring because of the development of products that skirt regulatory oversight.[5]  WBL cannot take advantage of a safe harbor provision intended for people who open their books to immunize a loan that would actually fall through the regulatory cracks.

## IV. PLAINTIFFS HAVE RAISED A VALID CLAIM UNDER CHAPTER 93A.

Although one might not know it from Defendants' abbreviated description of the "doomed to fail" count, Count II raises a valid claim under Chapter 93A.  Section 2(a) of Chapter 93A prohibits any "unfair or deceptive acts or practices in the conduct of any trade or commerce."  This breadth is intentional, as Courts have noted that "[t]here is no limit to human

---

[5] Compare, e.g., https://www.bloomberg.com/graphics/2018-confessions-of-judgment/ (discussing some modern techniques to evade regulatory scrutiny).

inventiveness in this field." *Commonwealth v. Fremont Inv. & Loan,* 452 Mass. 733, 742 (2008), *quoting Kattar v. Demoulas*, 433 Mass. 1, 13 (2000).

One such area of human creativity and invention is the creation of loan products that are structurally unfair to the individual taking the loan, which can result from the combination of the rates, the underwriting practice, the sensitive nature of the collateral, or any additional factor which in combination renders the loan unfair and deceptive under Chapter 93A.   That loans can run afoul of Chapter 93A based on their terms is not new ground.    In *Fremont*, for instance, the Supreme Judicial Court reviewed an injunction against foreclosing on any loan with four characteristics that, in combination, rendered the loan unfair.[6]   The trial court had concluded that "it is unfair for a lender to approve a home mortgage loan secured by the borrower's principal residence when the lender reasonably should have recognized that the loan is doomed to foreclosure unless the borrower's income or the fair market value of the residence increases." *Commonwealth v. Fremont Inv. & Loan*, 2008 Mass. Super. LEXIS 46, *37, 23 Mass. L. Rep. 567 (Mass. Super. Ct., Feb. 5, 2008).   On review, the SJC agreed, notwithstanding the fact that the loan did not violate any particular banking statute.   The transactions in *Fremont* violated Chapter 93A because "originating loans with terms that in combination would lead predictably to the consequence of the borrowers' default and foreclosure, were within established concepts of unfairness at the time the loans were made." 452 Mass. at 744.

---

[6] Specifically, "(1) the loans were ARM loans with an introductory rate period of three years or less; (2) they featured an introductory rate for the initial period that was at least three per cent below the fully indexed rate; (3) they were made to borrowers for whom the debt-to-income ratio would have exceeded fifty per cent had Fremont measured the borrower's debt by the monthly payments that would be due at the fully indexed rate rather than under the introductory rate; and (4) the loan-to-value ratio was one hundred per cent, or the loan featured a substantial prepayment penalty (defined by the judge as greater than the "conventional prepayment penalty" defined in G. L. c. 183C, § 2) or a prepayment penalty that extended beyond the introductory rate period." *Fremont*, 452 Mass. at 739.

Nor is *Fremont* the only case of its kind.   The First Circuit followed *Fremont* in concluding that a borrower raised triable issues of fact regarding whether a loan was doomed from the outset, and permitted the Chapter 93A claim to proceed to trial.   *Frappier v. Countrywide Home Loans, Inc.,* 645 F.3d 51, 58 (1st Cir. 2011) (borrower raised triable issues under *Fremont* precedent as to lender's knowledge).

Other cases have extended the doctrine beyond the specific combination at issue in *Fremont*.   The SJC, in extending the *Fremont* analysis fixed interest rate loans, explained "[n]othing in our decision in Fremont … was intended to suggest that the universe of predatory home loans is limited only to those meeting the four criteria present in that case." *Drakopouluos v. United States Bank Nat'l Ass'n*, 465 Mass. 775, 786 (2013).   As the Court noted, the important part was "whether the lender should have recognized at the outset that the plaintiffs were unlikely to be able to repay the loan." *Id.* at 786.   *See also Moronta v. Nationstar Mortgage, LLC*, 88 Mass. App. Ct. 621, 629 (2015) (summary judgment record raises genuine issues of material fact as to whether loan is unfair under Chapter 93A, where the loan contains different oppressive terms than those listed in *Fremont*) (superseded on unrelated grounds).   It is clear from *Drakopoulous* and *Moronta* that proving a violation of Chapter 93A under *Fremont* is *not* a question of whether a loan happened to have the four features at issue in *Fremont*, but only whether the lender should have recognized that plaintiffs were unlikely to be able to repay the loan.   Such recognition can also take the form of "reckless disregard of the risk of foreclosure." *Commonwealth v. H&R Block, Inc.*, 2008 Mass. Super. LEXIS 427, *10 (Nov. 25, 2008).

Here, the Complaint shows that the transaction here had these attributes:

- 92% APR.  ¶ 142.

- Expressly advertised to people with low credit scores. ¶152.

- Underwriting limited to several months bank statements. ¶153.

-17-

- Backed by personal guarantees. ¶¶ 40, 47, 86.

- Backed by mortgage on primary residence. ¶¶ 40, 48, 85.

The fact that this loan encumbers a primary residence should be considered notwithstanding the "business loan" label.[7]  WBL's loans are expressly structured to be backed by real estate such as a borrower's primary residence.  That these loans put family homes at risk is part of the calculus in weighing whether the totality of circumstances renders this transaction unfair or deceptive under Chapter 93A.  The product the SJC addressed in *Fremont* was also directed at homes.  *See also Commonwealth v. H&R Block, Inc., 2008 Mass. Super. LEXIS 427*, 25 Mass. L. Rep. 92, 93 (2008) (enjoining loans with unfair characteristics where "secured by the borrower's occupied principal residence").  That the loan in this case is termed a "business loan" rather than a "mortgage loan" may exempt it from certain regulations directed specifically at mortgages, but it does not immunize from Chapter 93A, nor does the labeling require the Court to avert its gaze from the fact that this loan's failure means the loss of a family home.  In *Fremont* itself, the Court found a Chapter 93A violation notwithstanding the loan's careful avoidance of statutory prohibitions.[8]  So too here: labeling notwithstanding, this product puts

---

[7] "[I]n a world in which thousands of drivers for your app-based ride-share have their own business and can finance their enterprise with a *business* loan, perhaps the theoretical line between consumer and business credit transactions has blurred over time." Exhibit H, p. 3, Prepared Statement of Hosea H. Harvey, Ph.D.

[8] "That the Legislature chose in the act to focus specifically on home loan mortgages with different terms and features from Fremont's is not dispositive; the question is whether the act may be read to establish a concept of unfairness that may apply in similar contexts. As stated by the single justice of the Appeals Court, the judge appropriately could and did 'look to Chapter 183C as an established, statutory expression of public policy that it is unfair for a lender to make a home mortgage loan secured by the borrower's principal residence in circumstances where the lender does not reasonably believe that the borrower will be able to make the scheduled payments and avoid foreclosure.'" *Fremont*, 452 Mass. at 749.

homes in jeopardy.  *Cf. H&R Block, Inc.,* ("[T]here were predatory home loans that fell outside the scope of the Act, but that did not make them any less predatory.").

The defendants err to focus on the absence of allegation regarding the plaintiffs' income. The issue is whether the loan's terms in combination make failure likely, not a simple arithmetic test of income to debt.  Here, in a systemic insufficiency, the lender extended credit based on insufficient data for a business loan.   In contrast to *Conley v. Sovereign Bank*, cited by defendants, the lender here lacked <u>any</u> evidence of personal income. The Complaint clearly states that the <u>only</u> financial information the broker gathered from the plaintiffs were the last four months of business bank statements, the last four months of merchant processing statements, and outstanding business debt of New England Distributors, Inc.  WBL required only six months of bank statements and a brief video interview.  Neither of the forms plaintiffs submitted contained any stated income for the plaintiffs.  Exhibits A and B.

Far from doing any diligence to confirm that plaintiffs' income could cover the loan, defendants did not even assess plaintiffs' income.  "[T]he Supreme Judicial Court noted that banks had been advised as early as 2001 that '[l]oans to borrowers who do not demonstrate the capacity to repay the loan, as structured, from sources other than the collateral pledged are generally considered unsafe and unsound' and unfair to borrowers." *Moronta*, 88 Mass. App. Ct. at 627, *quoting Fremont*, 452 Mass. at 744.  Here, defendants took plaintiffs' family home as collateral for a loan, after an underwriting process that relied exclusively on four to six months of bank statements, merchant processing statements, and outstanding debts.  Apparently omitted from consideration was any analysis of business costs or profit margin, any analysis of whether the business was cyclical or whether the limited bank statements were representative, and any analysis of whether either business profits or owner income could cover these loan payments.

## **CONCLUSION**

For the reasons set forth above, plaintiffs respectfully request that the Court deny the Motion to Dismiss.


Dated:  September 13, 2019          RAMANJEET KAUR, KULWINDER SINGH UPPAL, and NEW ENGLAND DISTRIBUTORS, INC.

By their attorneys,


*/s/Rachel Eisenhaure*
Shane R. Heskin (BBO # 665098)
Rachel J. Eisenhaure (BBO # 663876)
WHITE AND WILLIAMS LLP
101 Arch Street, Suite 1930
Boston, MA  02110
Tel.:  617.748.5200
heskins@whiteandwilliams.com
eisenhaurer@whiteandwilliams.com


## **CERTIFICATE OF SERVICE**

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on this 13th day of September, 2019.

*/s/Rachel Eisenhaure*
Rachel Eisenhaure