# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RAMANJEET KAUR, KULWINDER SINGH UPPAL, and NEW ENGLAND DISTRIBUTORS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> WORLD BUSINESS LENDERS, LLC, WBL SPO I, LLC, AXOS BANK, and ATLANTIS CAPITAL, LLC, <br><br> Defendants. | CIVIL ACTION NO. 1:19-cv-11364-WGY |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION TO DISMISS BY WORLD BUSINESS LENDERS, LLC, WBL SPO I, LLC, AND AXOS BANK**

The case described in Plaintiffs' Opposition does not exist. Plaintiffs argue that their lawsuit "stands at the intersection of two dangerous trends," one of which is "placing a home at risk by issuing a financial product doomed to fail," but there is no indication in the Complaint that the loan at issue was actually doomed to fail. Plaintiffs protest against "framing the loan as a 'business loan,'" but the product at issue was indisputably a business loan. According to their own brief, Plaintiffs "sought financing for their small business, New England Distributors, Inc." Opposition, 3. In support of this nonexistent case, Plaintiffs ask this Court to invent a new cause of action based on incorrect policy and legal arguments.

**I.      Plaintiffs' Policy Arguments Are Not a Basis for Litigation.**

On shaky ground both legally and factually, Plaintiffs turn to policy arguments. If Plaintiffs want to rehash failed policy arguments, they are free to bring their positions to the legislature. The arguments are not a basis for litigation.

**A.      This Novel Theory Is Not a Basis for Relief.**

Two of Plaintiffs' cited cases confirm that this is, at most, an issue to bring to the legislature. Unlike Massachusetts, Georgia actually has a statute on this issue, which provides: "A purported agent shall be considered a de facto lender if the entire circumstances of the transaction show that the purported agent holds, acquires, or maintains a predominant economic interest in the revenues generated by the loan." OCGA § 16-17-2(b)(4).[1] Plaintiffs' citations to Georgia cases merely emphasize the lack of a legal basis for Plaintiffs' claims here. See Ga. Cash Am. v. Greene, 734 S.E.2d 67 (Ga. App. 2012) and BankWest, Inc. v. Oxendine, 266 Ga. App. 771 (App. Ct. Ga. 2004) (both cited at Opposition, 8). If Plaintiffs seek to impose a similar rule, they can make the request to the legislature, not to the Federal court.[2]

Without legal precedent on their side here in Massachusetts, Plaintiffs cannot ask this Court to invent it. "Federal courts sitting in diversity should be cautious about 'pushing state law to new frontiers.'" Nicolaci v. Anapol, 387 F.3d 21, 27 (1st Cir. 2004) (quoting Kelly v. Mercantonio, 187 F.3d 192, 199 (1st Cir. 1999)). As the First Circuit has explained in another diversity case:

---

[1] Defendants note that any such statute raises Federal preemption issues, which is not necessary to raise in the current brief.

[2] Recognizing that this is a matter for the legislature, Plaintiffs' counsel Shane R. Heskin submitted written testimony to the United States House of Representatives Committee on Small Business regarding this issue. Written Testimony of Shane R. Heskin, "Crushed by Confessions of Judgment: The Small Business Story" (June 26, 2019), 17-18, available at https://smallbusiness.house.gov/uploadedfiles/06-26-19_mr._heskin_testimony.pdf.

> [W]e are in a particularly poor position, sitting as a federal court in a diversity case, to endorse the fundamental policy innovation implicit in the [plaintiffs'] theory. Absent some authoritative signal from the legislature or the courts of Massachusetts, we see no basis for even considering the pros and cons of innovative theories . . . . We must apply the law of the forum as we infer it presently to be, not as it might come to be.

Dayton v. Peck, Stow & Wilcox Co. (Pexto), 739 F.2d 690, 694 (1st Cir. 1984).

### B. Plaintiffs' Policy Arguments Are Untenable.

Plaintiffs' policy arguments are not only misplaced, but contrary to actual public policy. The new cause of action that Plaintiffs seek would create substantial problems for banking law. Accordingly, the Federal Deposit Insurance Corporation ("FDIC") and Office of the Comptroller of the Currency have taken the opposite position.

Earlier this year, in a case involving a loan validly made by a state bank, the U.S. Bankruptcy Court for the District of Colorado recognized that "state banks . . . have the power to assign promissory notes with such compliant interest rates to other entities, including national banks, other state banks, and non-banks such as the Lender. This has been an American rule for centuries." Rent-Rite SuperKegs W., Ltd. v. World Bus. Lenders, LLC (In re Rent-Rite SuperKegs W., Ltd.), 603 B.R. 41, 65 (Bankr. D. Colo. 2019). The Court applied "[t]he long-established 'valid-when-made' rule" to conclude that "if the interest rate in the original loan agreement was non-usurious, the loan cannot become usurious upon assignment — so, the assignee lawfully may charge interest at the original rate." Id. at 66. Despite Plaintiffs' contentions, the policy arguments are against them. As the Court in Colorado explained: "Any contrary legal standard would interfere with the proper functioning of state banks and risk a myriad of problems." Id.

On appeal in that case, the FDIC and the Office of the Comptroller of the Currency ("Federal Amici") filed in amicus brief in support of affirmance. See generally Exhibit A hereto. The Federal Amici urged that affirming the bankruptcy court's decision is

> particularly important because it goes to one of the core elements of the banks' ability to engage in safe and sound banking: their ability to sell loans. . . . [T]he ability to sell loans (and transfer enforceable rights to the buyer) is necessary for banks to be able to satisfy depositor withdrawals or repay large debts; to maintain adequate levels of capital and liquidity; to diversify their funding sources and interest-rate risk, and to have funds available for further lending to consumers.

Id. at 1. The Federal Amici confirmed that the bankruptcy court had "correctly explained . . . the longstanding valid-when-made rule[.]" Id. at 3; see also id. at 10 (discussing the rule). It held: "The valid-when-made rule is dispositive here: since usury must exist at the inception of the contract, a later act—such as assignment—cannot change the non-usurious character of a loan that was not usurious when made." Id. at 11. That rule is likewise dispositive of this case.

Moreover, the same policy concerns raised by the Federal Amici would govern any attempt to change the law. "The valid-when-made rule has withstood the test of time because it is compelled by commercial needs, fundamental fairness, and general principles of contract law." Id. at 12. Plaintiffs seek to inject enormous instability into the banking world by causing lenders and their assignees to fear being targeted by a "true lender" lawsuit that would unravel utterly routine assignments. This is not in the public interest, and it is not a basis to change Massachusetts law.

### C. This Case Does Not Actually Present Plaintiffs' Policy Issues.

Even if it were proper for plaintiffs to rely on policy arguments in a Federal diversity case, their policy arguments do not actually match the facts of this case. Plaintiffs begin their brief by arguing that this case presents the "dangerous trend[]" of "placing a home at risk by issuing a financial product doomed to fail" (Opposition, 1), but this case does not involve any

4

"financial product doomed to fail." As discussed in Defendants' original Memorandum, the Complaint does not set forth any facts supporting the allegation that the loan was doomed to fail. Memorandum in Support of Motion to Dismiss, 10-11.

The Plaintiffs also write about situations where "a loan is designated a business loan," or where parties "fram[e] the loan as a 'business loan'" (Opposition, 1), insinuating that the loan at issue is actually something else. There is, however, no dispute that this case addresses a true business loan. The Complaint alleges: "Mr. Uppal needed additional capital to grow his business, New England Distributors, Inc." Complaint, ¶ 22.

## II. Plaintiffs' Statement that "The True Lender Doctrine is Accepted Massachusetts Law" Is False.

Plaintiffs have no meaningful support for their assertion that "The True Lender Doctrine is Accepted Massachusetts Law." Opposition, 6.

### A. Plaintiffs Misstate a Tribal Lending Case.

There is no support in Massachusetts for the proposition that federally chartered banks' transactions can be nullified by a "true lender" theory. Recognizing this, Plaintiffs instead misstate a Massachusetts Superior Court case involving tribal lending. Plaintiffs discuss <u>Comm. of Massachusetts v. Western Sky Financial, LLC</u>, Case No. 1584-CV-3044, which was filed in Suffolk County on October 6, 2015. Opposition, <u>Exhibit E</u>; see also <u>Exhibit B</u> hereto, Superior Court Docket. Within the month, the parties reached a settlement. Opposition, <u>Exhibit F</u>; <u>see also</u> <u>Exhibit B</u>, Superior Court Docket. The Defendants never brought (and the Superior Court certainly never ruled on) a motion to dismiss. <u>Exhibit B</u>.

Plaintiffs' report of the case history is false. Plaintiffs first (correctly) note that "On October 6, 2015, the Massachusetts' [sic] Attorney General filed a complaint (Exhibit E,

5

attached) in Superior Court" against Western Sky and Cash Call.  Opposition, 6.  Plaintiffs then claim:

> In response, Western Sky and CashCall asserted that they were not subject to the regulators' jurisdiction because the loans were provided through Western Sky, which was located on the Cheyenne River Indian Reservation in South Dakota, and therefore had tribal immunity from state and federal banking laws.  The defendants argued that the rates charged were permissible under tribal law.  Their argument was rejected by the trial court.  After losing their jurisdictional arguments, the defendants settled the lawsuit with the Massachusetts Attorney General.

Id.

The problem is that nowhere can Defendants find a reported decision in that case indicating that Western Sky and Cash Call brought such arguments in that case, or that the trial court rejected such arguments.  The docket shows that the case was filed on October 6, 2015 and resolved by agreement that same month.  Exhibit B.  Tellingly, Plaintiffs do not actually cite the supposed trial court decision at issue.  Even by Plaintiffs' description, the supposed decision does not appear to have any bearing on any true lender issue.  Of course, even if there were a relevant Superior Court decision, a single trial court decision would not support Plaintiffs' contention that any "true lender doctrine" is actually Massachusetts law.  Opposition, 6.

### B. Plaintiffs Provide No Other Support.

Plaintiffs provide no other authority for the idea that Massachusetts law has enshrined a true lender doctrine.  They rely on a letter from various state attorneys general to the FDIC.  Opposition, 7 and Exhibit G.  The letter was provided in response to the FDIC's request for "information on the consumer demand for small-dollar credit products, the supply of small-dollar credit products currently offered by banks, and whether there are steps the FDIC could take to better enable banks to provide such products to consumers to meet demand."  Federal Register, Vol. 83, No. 224, 58567 (Nov. 20, 2018).  (The present case does not involve either a small-

dollar credit product or a consumer loan.) Plaintiffs cannot seriously suggest that the letter itself is legal authority. Nor can a letter signed by attorneys general establish how the independent judiciaries in each state would decide the issue. Moreover, nothing in that letter bolsters Plaintiffs' assertion that Massachusetts applies a "true lender" doctrine to federally chartered banks. Like Plaintiffs, the letter cites out-of-state cases. See Opposition, 7 (quoting a section of the letter that cites cases from other jurisdictions). Moreover, as explained above, the FDIC has rejected such arguments.

In support of their tangential argument that Massachusetts supports the "concept of placing substance over form" (Opposition, 9), Plaintiffs cite three inapt cases. Plaintiffs first cite a case from 1862: Sylvester v. Swan, 87 Mass. 134. In that case, the Court held: "Usury does not consist in the intent with which parties take or pay unlawful interest. It is the transaction to which the law looks, in order to ascertain whether it is usurious or otherwise." Id. at 136. This thwarts Plaintiffs' arguments that an alleged improper intention should undo the actual contract. Next, Plaintiffs cite Hopkins v. Flower, a 1926 case that applied New York law, and that had no bearing on "true lender" issues. 256 Mass. 367. In addition to applying another state's law, that case addressed an irrelevant question (the relationship between an illegal commission and the usury statute). Both Sylvester and Hopkins predate the National Bank Act. Finally, Plaintiffs cite a Superior Court case in which a transaction was disguised as a contract for future purchases, rather than a loan. In re Stone St. Capital, LLC, 2013 Mass. Super. LEXIS 45, at *11 (Mass. Super. Ct. 2013). In this case, all parties agree that the contract was a loan.

**III.     Plaintiffs' Arguments Regarding Record-Keeping Rely on Inapposite Policy Issues.**

Once again, discontent with the actual law in Massachusetts, Plaintiffs ask this Court to change it.  As discussed in Defendants' original Memorandum, M.G.L. c. 271, § 49(d) sets forth specific types of information that must be included in record keeping.  The statute does not require records to contain the name of the lender.  Plaintiffs improperly ask this Court to rewrite the statute.

This request is particularly improper because M.G.L. c. 271, § 49 is a criminal statute.  "It is a well-established proposition that criminal statutes are to be construed narrowly." Commonwealth v. Kerr, 409 Mass. 284, 286 (1991).  Plaintiffs' request flouts that rule and would create a new category of exposure to criminal liability.  The itemized list of required information in the statute is exhaustive, and nothing in its text indicates otherwise.

Plaintiffs' policy argument is confused.  They argue that "Loan holders are entitled to know whom they owe money" (Opposition, 14), but no record keeping issues interfered with Plaintiffs' decision to sue both Axos and WBL, and to concoct a "true lender" theory.  This argument also conflates two distinct issues: the information that a lender retains *internally* pursuant to a statutory records keeping requirement, and the information provided to the borrower.  Policy arguments about the information that a borrower should receive simply have no place in interpreting a statute about internal record keeping.

## CONCLUSION

For these reasons, and for the reasons set forth in Defendants' original Memorandum, they respectfully request that this Court dismiss the claims against them with prejudice, and enter such other and further relief as is just.

                                              WORLD BUSINESS LENDERS, LLC, WBL SPO I, LLC, and AXOS BANK

                                              By their attorneys,

                                              */s/* Patrick P. Dinardo
                                              Patrick P. Dinardo (BBO No. 125250)
                                              pdinardo@sandw.com
                                              Erika L. Todd (BBO No. 689053)
                                              etodd@sandw.com
                                              SULLIVAN & WORCESTER LLP
                                              One Post Office Square
                                              Boston, MA 02109
                                              (617) 338-2800 (phone)
October 4, 2019                           (617) 338-2880 (fax)

## CERTIFICATE OF SERVICE

I, Erika L. Todd, certify that on October 4, 2019, this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF and paper copies will be sent to any indicated as non-registered participants.

                                              /s/ Erika L. Todd