## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

**Civil Action No. 1:19-cv-01552-REB**
**(Appeal from Bankruptcy Adversary Proceeding No. 18-1099-TBM)**

In re: RENT-RITE SUPER KEGS WEST LTD

Debtor

---

RENT-RITE SUPER KEGS WEST LTD,

      Appellant,

v.

WORLD BUSINESS LENDERS, LLC,

      Appellee.

---

### AMICUS BRIEF OF THE FEDERAL DEPOSIT INSURANCE CORPORATION AND THE OFFICE OF THE COMPTROLLER OF THE CURRENCY IN SUPPORT OF AFFIRMANCE AND APPELLEE

---

Dated September 10, 2019

JONATHAN V. GOULD
Senior Deputy Comptroller and
Chief Counsel
BAO NGUYEN
Principal Deputy Chief Counsel
GREGORY F. TAYLOR
Director of Litigation
MICHAEL K. MORELLI
Office of the Comptroller of
the Currency
400 7th Street S.W.
Washington, D.C. 20219
(202) 649-6306
Gregory.Taylor@occ.treas.gov

NICHOLAS J. PODSIADLY
General Counsel
FLOYD I. ROBINSON
Deputy General Counsel
COLLEEN J. BOLES
Assistant General Counsel
J. SCOTT WATSON
Senior Counsel
MINODORA D. VANCEA
Federal Deposit Insurance Corporation
3501 Fairfax Drive, VS-D7176
Arlington, VA 22226-3500
(703) 562-2049
mvancea@fdic.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

INTEREST OF THE AMICI ..................................................................................... 1

SUMMARY OF ARGUMENT .................................................................................. 3

ARGUMENT ............................................................................................................. 4

    The Bankruptcy Court Correctly Decided That The Interest Rate In The
    Promissory Note Was Valid When The Note Was Made And Remains
    Valid Despite The Note's Later Assignment ........................................................... 4

    A.  The Interest Rate In The Promissory Note Was Valid When Made
        Because Section 1831d Allows The Bank To Charge Any Rate
        Allowed By Its Home State ...................................................................... 4

    B.  The Interest Rate In The Promissory Note Remains Valid And
        Enforceable Despite The Note's Assignment ........................................... 9

        1.  Under The Longstanding Valid-When-Made Rule, An Interest
            Rate That Was Non-Usurious When The Loan Was Made
            Remains Non-Usurious Despite Assignment ................................. 10

        2.  Under Another Well-Settled Rule, An Assignee Succeeds
            To All The Assignor's Rights In The Contract, Including The
            Right To Receive The Interest Rate Agreed Upon In The
            Contract ........................................................................................ 14

        3.  Section 1831d Itself Gives Banks The Power To Assign Their
            Home-State Rates .......................................................................... 16

    C.  The Debtor's Cases Are Inapposite .......................................................... 21

CONCLUSION ......................................................................................................... 24

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

## CASES

*Ahmad v. Furlong*,
    435 F.3d 1196 (10th Cir.2006) ........................................................9

*Arizona v. U.S.,*
    567 U. S. 387 (2012) ...................................................................20

*Bob Jones University v. U.S.,*
    461 U.S. 574 (1983)....................................................................18

*Concord Realty v. Cont'l Funding,*
    776 P.2d 1114 (Colo. 1989)..........................................................12

*Coral Gables First Nat'l Bank v. Constructors of Florida,*
    119 So.2d 741 (Fla.App.3d 1960) .................................................13

*Dean Witter Reynolds Inc. v. Var. Annuity Life Ins. Co.,*
    373 F.3d 1100 (10th Cir. 2004) ............................................ 14, 15

*Discover Bank v. Vaden*,
    489 F.3d 594 (4th Cir. 2007)
    *rev'd on other grounds,* 129 S. Ct. 1262 (2009) ........................2, 6

*FAIC Securities, Inc. v. U.S.,*
    768 F.2d 352 (D.C. Cir. 1985).......................................................1

*Farmers Acceptance Corp. v. Howard K. Delozier Construction Co.,*
    496 P.2d 1016 (Colo. 1972)..........................................................15

*FDIC v. Lattimore Land Corp.,*
    656 F.2d 139 (5th Cir. 1981) ............................................... 11, 12

*FDIC v. Tito Castro Constr. Co.,*
    548 F. Supp. 1224 (D.P.R. 1982) .................................................13

*Fidelity Federal Savings & Loan Assn. v. de la Cuesta,*
    458 U. S. 141 (1982) ....................................................................20

*First Nat'l Bank v. Danek,*
    556 P.2d 31 (N.M. 1976) ...............................................................13

*Franklin Nat'l Bank v. New York,*
    347 U.S. 373 (1954)......................................................... 19, 20, 22

*Gaither v. Farmers' & Mechanics' Bank of Georgetown,*
    26 U.S. (1 Pet.) 37 (1828)..............................................................10

*Gavey Prop. / 762 v. First Financial Sav. & Loan Assoc.,*
    845 F. 2d 519 (5th Cir. 1988) ............................................... 5, 6, 9

*Gould v. Jackson,*
    257 Wis. 110 (1950) .....................................................................15

*Greenwood Tr. Co. v. Mass.,*
    971 F.2d 818 (1st Cir. 1992)................................................. 2, 5, 6, 8

*Highway Equip. & Supply Co. v. Jones,*
    153 N.W.2d 859 (Neb. 1967) ........................................................13

*Hoffman v. Key Federal Sav. and Loan Ass'n.,*
    416 A.2d 1265 (Md. 1979) ............................................................12

*In Re Rent-Rite Superkegs West, Ltd.,*
    2019 WL 2179688 (Bankr. Colo. May 20, 2019) ................................ *passim*

*Jackson v. Thweatt,*
    883 S.W.2d 171 (Tex. 1994) .........................................................16

*Madden v. Midland Funding, LLC,*
    786 F.3d 246 (2d Cir. 2015) ............................................. 21, 23, 24

*Marquette Nat'l Bank of Minneapolis v. First Omaha Serv. Corp.,*
    439 U.S. 299 (1978)....................................................................6, 9

*Meade v. Avant of Colorado, LLC,*
    307 F. Supp. 3d 1134 (D. Colo. 2018) .................................................. 21, 22

*Morales v. TWA*,
    504 U.S. 374 (1992)....................................................................................6

*Nichols v. Fearson,*
    32 U.S. (7 Pet) 103 (1833)............................................................ 10, 11, 12

*Olvera v. Blitt & Gaines, P.C.,*
    431 F.3d 285 (7th Cir. 2005) .......................................................................14

*Planters' Bank of Miss. v. Sharp,*
    47 U.S. 301 (1848)........................................................................ 16, 18, 19

*Rangen, Inc. v. Valley Trout Farms, Inc.,*
    658 P.2d 955 (Id. 1983) ...............................................................................13

*Rauscher Pierce Refsnes, Inc. v. FDIC*,
    789 F.2d 313 (5th Cir. 1986) .........................................................................1

*Saul v. Midlantic Nat'l Bank South,*
    572 A.2d 650 (N.J. App. Div. 1990) ...........................................................13

*Schmeling v. NORDAM,*
    97 F.3d 1336 (10th Cir. 1996) .....................................................................21

*Southwest Concrete Prods. v. Gosh Construction Corp.,*
    51 Cal.3d 701 (1990) ...................................................................................13

*Sprint Communications Co. v. APCC Services, Inc.,*
    554 U.S. 269 (2008)....................................................................................18

*State v. J. C. Penney Co.,*
    179 N.W.2d 641 (Wis. 1970) .....................................................................12

*Stoorman v. Greenwood Trust Co.,*
    908 P.2d 133 (Colo. 1995)................................................................ 2, 6, 8, 9

*Strike v. Trans-West Discount Corp.,*
    92 Cal.App.3d 735 (Cal. Ct. App. 4th Dist. 1979) ..................... 11, 12, 17, 18

*Tate v. Wellings,*
    100 Eng. Rep. 716 (K.B. 1790) ...................................................................10

*Tivoli Ventures, Inc. v. Bumann,*
    870 P.2d 1244 (Colo. 1994)................................................................ 15, 16

*Tuttle v. Clark,*
    4 Conn. 153 (1822) ....................................................................................11

*Unity Plan Finance Co. v. Green,*
    155 So. 900 (La. 1934) ...............................................................................13

*Waggener v. Holt Chew Motor Co.,*
    274 P.2d 968 (Colo. 1954)...........................................................................12

*Watkins v. Taylor,*
    16 Va. 424 (1811) ......................................................................................10

## STATUTES

6 Am. Jur. 2d Assignments § 108 ..........................................................................14

12 U.S.C. § 85 ............................................................................................. *passim*

12 U.S.C. § 1831d ....................................................................................... *passim*

44B Am. Jur. 2d Interest and Usury § 65 (2018)...................................................10

WIS. STAT. ANN. § 138.05(5) ................................................................................7

## OTHER AUTHORITIES

Blackstone, William, Commentaries on the Laws of England
  (18th London ed., W.E. Dean 1838)....................................................................10

Depository Institutions Deregulation and Monetary Control Act of 1980
  PL 96–221, 94 Stat 132 (March 31, 1980) ............................................................6

FDIC, Credit Cart Securitization Manual, Introduction (2007)
  https://www.fdic.gov.regulations/examinations/credit_card
  _securitization.html.................................................................................................18

FDIC General Counsel's Opinion No. 11, Interest Charges by Interstate State
  Banks, 63 Fed. Reg. 27282 (May 18, 1998) ..........................................................6

Federal Rules of Bankruptcy Procedure Rule 8017 ...................................................2

S Rep No. 96-368, 95th Cong., 1st Sess. (1979),
  1980 U.S.C.C.A.N. 236 .......................................................................................17

Brief of The United States as Amicus Curiae,
  2016 WL 2997343 (May 24, 2016) ......................................................................24

United States Dep't of Treasury, Report: *A Financial System That Creates
  Economic Opportunities, Nonbank Financials, Fintech, and Innovation*
  (July 2018), https://home.treasury.gov/sites/default/files/2018-07/A-Financial-
  System-that-Creates-Economic-Opportunities---Nonbank-Financi....pdf ...........23

# INTEREST OF THE AMICI

"To restore depositor confidence and stimulate economic growth" after the stock market crash of 1929 had "resulted in an almost total collapse of the nation's banking system," Congress in 1933 established the federal deposit insurance system and created the Federal Deposit Insurance Corporation ("FDIC") to administer it.[1] For over eight decades since then, the FDIC has preserved and promoted public confidence in the U.S. financial system by insuring deposits at banks and savings institutions (currently over $7.6 trillion); by supervising and regulating thousands of banks and savings institutions;[2] by identifying, monitoring, and addressing risks to the deposit insurance funds; and by acting as receiver of failed financial institutions so as to limit the effect on the economy and the financial system when a bank fails. The Office of the Comptroller of the Currency ("OCC") was created in 1863 in order to ensure "a safe and sound banking system"—a key element to the "stability of the nation."[3] The OCC charters, regulates, and supervises all national banks and federal savings associations.

In recognition of the national importance of cases interpreting 12 U.S.C. § 1831d, and of their direct impact on the banking and financial markets, the FDIC has filed numerous amicus briefs over the years in such cases. The courts deciding

---

[1] *FAIC Securities, Inc. v. U.S.*, 768 F.2d 352, 354 (D.C. Cir. 1985).

[2] The FDIC insures deposits at 5,303 insured depository institutions and directly supervises 3,418 state-chartered banks and savings institutions that are not members of the Federal Reserve System, and provides back-up supervision for all banks and savings associations in the United States.

[3] *Rauscher Pierce Refsnes, Inc. v. FDIC*, 789 F.2d 313, 314 (5th Cir. 1986).

1

those cases have adopted the interpretation of Section 1831d presented in the FDIC's amicus briefs.[4]  This appeal is just as important as those other cases interpreting Section 1831d, and is particularly important because it goes to one of the core elements of the banks' ability to engage in safe and sound banking: their ability to sell loans.  As we discuss in this brief, the ability to sell loans (and transfer enforceable rights to the buyer) is necessary for banks to be able to satisfy depositor withdrawals or repay large debts; to maintain adequate levels of capital and liquidity; to diversify their funding sources and interest-rate risks, and to have funds available for further lending to consumers.

The interpretations at issue in this appeal thus have serious implications for thousands of banks and financial institutions across the country, potentially affecting their ability to maintain their safety and soundness through loan sales and securitizations, which could have unintended consequences for consumers, credit markets, and the U.S. financial system.

Under Rule 8017(a)(2), the FDIC and OCC, as agencies of the United States, "may file an amicus brief without the consent of the parties or leave of court."  As federal banking regulators charged by Congress with ensuring the safety and soundness of state and national banks and with maintaining financial stability in the banking system, the FDIC and OCC have unique expertise and perspectives that warrant the Court's attention.

---

[4] *See, e.g.*, *Stoorman v. Greenwood Trust Co.*, 908 P.2d 133 (Colo. 1995); *Greenwood Tr. Co. v. Mass.*, 971 F.2d 818 (1st Cir. 1992); *Discover Bank v. Vaden*, 489 F.3d 594, 604-06 (4th Cir. 2007) *rev'd on other grounds,* 129 S.Ct. 1262 (2009).

## SUMMARY OF ARGUMENT

The bankruptcy court correctly decided both (1) that the interest rate in the Promissory Note was valid and enforceable when the Note was made (May 20, 2019 Order ("Op.") at 18-20), and (2) that it remained valid and enforceable after the Note's assignment (Op. at 20-22).[5]

The first conclusion is not seriously in dispute, as the plain text of 12 U.S.C. § 1831d expressly provides that a state bank may charge whatever interest rate is permitted by the laws of the state where it is located (here, Wisconsin), and that the usury laws of other states are preempted. Numerous Supreme Court and federal court decisions foreclose any contrary result. Because Wisconsin law permits the interest rate to which the parties agreed in the Promissory Note, Bank of Lake Mills was permitted to charge that interest rate, and the interest rate was valid and enforceable when the Note was made. *Id*.

The second conclusion is compelled by well-settled law. First, as the bankruptcy court correctly explained, under the longstanding valid-when-made rule, "if the interest rate in the original loan agreement was non-usurious, the loan cannot become usurious upon assignment—so, the assignee lawfully may charge interest at the original rate." Op. 21. Second, the same conclusion follows from another fundamental rule of contract law, namely that an assignee succeeds to all the assignor's

---

[5] The Order is included in Appendix A to Appellant's brief.

rights in the contract, including the right to receive the consideration agreed upon in the contract—here, the interest rate agreed upon.  Under this rule, because the assignor (the bank) was authorized to charge the interest in the Promissory Note, the assignee inherited the same contractual right, since contract law puts the assignee in the assignor's shoes.  Third, the same result is required by the text of Section 1831d. It is well-settled that a bank's power to make loans carries within it the power to assign them, and thus a bank's statutory power under Section 1831d to make loans (at particular rates) necessarily includes the power to assign the loans (at those rates).

## ARGUMENT

**The Bankruptcy Court Correctly Decided That The Interest Rate In The Promissory Note Was Valid When The Note Was Made And Remains Valid Despite The Note's Later Assignment**

The bankruptcy court correctly decided that the interest rate in the Promissory Note is valid under Section 1831d, which allows Bank of Lake Mills to charge any rate allowed by the state where the bank is located (Wisconsin) and preempts the contrary state usury laws of other states.  The bankruptcy court also correctly decided that that interest rate remains valid despite the Note's later assignment.

**A.   The Interest Rate In The Promissory Note Was Valid When Made Because Section 1831d Allowed The Bank To Charge Any Rate Allowed By Its Home State**

1.  Section 1831d allows federally-insured state banks to charge interest at the highest of (1) a federal rate tied to the discount rate on 90-day commercial paper, or (2) "the rate allowed by the laws of the State … where the bank is located."  12

U.S.C. § 1831d.  Section 1831d borrowed its language from the earlier-enacted 12 U.S.C. § 85, which allows national banks to charge these same rates.  *Greenwood*, 971 F.2d at 826-27.  Congress patterned Section 1831d after 12 U.S.C. § 85 in order to achieve "parity" and "competitive equality" between state and national banks in the interest-rate area.  *Id.* (citations omitted).

Ensuring competitive equality through Section 1831d was key to resolving the credit crunch and the troubles in the state banking sector existing at the time of Section 1831d's enactment in 1980.  Specifically, "[a]s the 1970s wound down, the Nation was caught in the throes of a devastating credit crunch.  Interest rates soared." *Id*.  "Nevertheless, state lending institutions were constrained in the interest they could charge by state usury laws which often made loans economically unfeasible from a lender's coign of vantage," which further deepened the credit crunch.  *Id*.  In addition, unable to make loans at the low rates required by state usury rates, state banks could not serve their customers' demand for credit and were thus "being battered by competition from national banks that were allowed to charge higher rates of interest by federal law."  *Gavey Properties/762 v. First Fin. Sav. & Loan*, 845 F.2d 519, 521 (5th Cir.1988).  Specifically, national banks enjoyed a competitive advantage under Section 85 because they could charge the high federal rates prevailing then, and, when such banks were located in states that had eliminated or relaxed usury ceilings, they could also export the higher interest rates of their home states to

transactions with out-of-state borrowers, notwithstanding the lower usury limits in the borrowers' states. *See Marquette Nat'l Bank of Minneapolis v. First Omaha Serv. Corp.*, 439 U.S. 299, 308, 318-19 (1978) (confirming that national banks can export rates).[6] Congress therefore passed the Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDA"), which added Section 1831d, in order to level the playing field between state and national banks, and to "assure that borrowers could obtain credit in states with low usury limits." *Gavey*, 845 F.2d at 521.

Because the text of Section 1831d was patterned after Section 85 and borrows its language, and because Congress expressly intended to achieve parity between the application of the two statutes, the courts and the regulators have given Section 1831d and Section 85 the "same interpretation." *Stoorman*, 908 P.2d at 135; *see also Morales v. TWA*, 504 U.S. 374, 383 (1992) (courts give statutes sharing the same language the same interpretation); *Greenwood*, 971 F.2d 818 at 827 (reading Section 1831d to allow exportation of interest rates just like Section 85 because "[t]he historical record clearly requires a court to read the parallel provisions of DIDA and [Section 85] *in pari materia*"); *Vaden*, 489 F.3d at 604-06 (explaining that Section 1831d "is to state-chartered banks" as Section 85 "is to national banks" and interpreting the statutes in the same manner); FDIC General Counsel's Opinion

---

[6] This brief uses "home state" as a shorthand for the state "where the bank is located," the statutory term used in Section 1831d.

No. 11, Interest Charges by Interstate State Banks, 63 Fed. Reg. 27282 (May 18, 1998) (to achieve "parity" and given the borrowed language, Section 1831d must receive the same interpretation as Section 85).

2. Section 1831d authorizes Bank of Lake Mills to make loans at the interest rate "allowed by the laws of the State … where the bank is located."  12 U.S.C. § 1831d.  Since Bank of Lake Mills is located in Wisconsin, Section 1831d thus authorizes it to charge interest at the rate allowed in Wisconsin.  Like many other states, Wisconsin does not have usury laws that apply to loans to corporations, allowing banks to charge corporate customers like the Debtor *any* rate, including the rate at issue here.  *See* WIS. STAT. ANN. § 138.05(5) ("This section [on usury rates] shall not apply to loans to corporations or limited liability companies.").

Accordingly, under the plain text of Section 1831d, Bank of Lake Mills was allowed to charge the interest rate in the Promissory Note because Wisconsin, its home state, allows it.  The contrary laws of other states are preempted, as expressly provided in Section 1831d:

> if the applicable rate prescribed in this subsection exceeds the rate [a] State bank … would be permitted to charge in the absence of this subsection, such State bank … *may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section*, take, receive, reserve, and charge on any loan … interest … at the rate allowed by the laws of the State … where the bank is located ….

12 U.S.C. § 1831d(a) (emphasis added).

7

Section 1831d thus provides that "if" the rate that Bank of Lake Mills "would be permitted to charge in the absence" of Section 1831d were the Colorado usury rate, that rate would be preempted because the rate "prescribed" in Section 1831d (the highest of the Wisconsin rate or the federal rate) "exceeds" the Colorado rate. *Id.* Thus, there is no need to perform a choice-of-law analysis to determine whether Colorado or Wisconsin law applies to the Promissory Note in addition to federal law: Colorado usury law either does not apply (the Note selects Wisconsin law) or, if it applies, it is preempted under Section 1831d.[7]

Numerous decisions from the U.S. Supreme Court and the federal courts of appeals interpreting Section 1831d and its national bank analog (Section 85), further confirm the plain meaning of the statute: that state and national banks may make loans at the rates allowed by the state where the bank is located, not where the borrower is located, and thus the usury laws of the borrowers' states are preempted. *See, e.g.*, *Greenwood*, 971 F.2d at 826-27 (holding that Massachusetts usury laws are inapplicable because Section 1831d permits a state bank located in Delaware to export its home state interest rates to out-of-state borrowers); *Stoorman*, 908 P.2d at 135-36 (holding that under Section 1831d, a state bank located in Delaware can

---

[7] The state law applying to the Deed of Trust is irrelevant: the Deed of Trust does not charge interest (it only imposes a security), so usury laws are inapplicable to it, as the bankruptcy court explained.  Op. 39-40.  But even if Colorado law applied because of the Deed of Trust's choice-of-law clause, it is preempted under Section 1831d because the permissible Wisconsin rate "exceeds" the Colorado rate.  12 U.S.C. § 1831d(a).  Nothing in the choice-of-law clause precludes application of federal law: in fact, that clause expressly states that both Colorado and federal law apply.  Op. 6.  The Supremacy Clause resolves the conflict between them.

charge Colorado customers certain interest (late fees) permitted by Delaware law but not by Colorado law); *Marquette*, 439 U.S. at 313 (Section 85 allows a national bank located in one state (there, Nebraska) to export the higher interest rates of its home state to transactions with out-of-state borrowers); *Gavey*, 845 F.2d at 521 ("Section 85 allows a [national] bank to 'export' the favorable usury rate of its home state").

Accordingly, the bankruptcy court correctly concluded that under Section 1831d, the loan here was not usurious when the bank made it because it was permitted by Wisconsin law, notwithstanding the Colorado Usury Statute, which is preempted.  Op. 20.  Indeed, the Colorado Supreme Court itself concluded that under Section 1831d, Colorado law is inapplicable in cases such as here, where a loan is made by a state bank located outside Colorado.  *Stoorman*, 908 P.2d at 136.[8]

### A.   The Interest Rate In The Promissory Note Remains Valid And Enforceable Despite The Note's Assignment

The bankruptcy court also correctly decided that "a promissory note originated by a state bank with a non-usurious interest rate under DIDA Section 1831d" cannot be "transformed into a usurious promissory note by virtue of assignment to a non-bank entity."  Op. 21.  This conclusion is compelled not only by the valid-when-made rule and foundational principles of assignment law but also by Section 1831d itself.

---

[8] The Debtor's waiver argument fails.  A court has discretion to allow a party to "'constructively' amend [its] answer" by raising an affirmative defense in briefing without formal amendment.  *Ahmad v. Furlong*, 435 F.3d 1196, 1202 (10th Cir. 2006).  *See* Op. 24 n.58 (allowing Lender to assert the preemption defense because Lender raised it in the "Supplemental Legal Briefs").

1. **Under The Longstanding Valid-When-Made Rule, An Interest Rate That Was Non-Usurious When The Loan Was Made Remains Non-Usurious Despite Assignment**

For nearly 200 hundred years, it has been settled law that the "usurious nature of a transaction is [determined] at the inception of the transaction" and that "usury therefore must exist at the inception of the contract."  44B Am. Jur. 2d Interest and Usury § 65 (2018).  Under this well-established and widely-accepted rule, if a contract was valid (not usurious) when it was made, it cannot be rendered usurious by later acts: "if the note [is] free from usury, in its origin, no subsequent … transactions … can affect it with the taint of usury."  *Gaither v. Farmers' & Mechanics' Bank of Georgetown*, 26 U.S. 37, 43 (1828).

By the time the Supreme Court applied this valid-when-made rule in several cases in the nineteenth century, the rule was already so well-established that the Supreme Court described it as a "cardinal rule" of American law.  *Nichols v. Fearson*, 32 U.S. 103, 109 (1833); *see also Watkins v. Taylor*, 16 Va. 424, 436 (1811) ("[I]f it was not usury at the time when the contract was entered into, no after circumstance can make it so"); 1 William Blackstone, Commentaries on the Laws of England 379 n.32 (18th London ed., W.E. Dean 1838) ("[t]he usury must be part of the contract in its inception" for a contract to be deemed usurious); *Tate v. Wellings*, 100 Eng. Rep. 716, 721 (K.B. 1790) ("it must be shown that [the contract] was usurious at the time when it was entered into; for if the contract were legal at that time, no subsequent event can make it usurious").

The valid-when-made rule is dispositive here: since usury must exist at the inception of the contract, a later act—such as assignment—cannot change the non-usurious character of a loan that was not usurious when made.  The Supreme Court has already held so in dealing precisely with the assignment issue, and so have many other courts more recently.  *Nichols*, 32 U.S. at 106 (holding that the non-usurious character of a note does not change despite the note's assignment to another person, because "the rule of law is everywhere acknowledged, that a contract, free from usury in its inception, shall not be invalidated by any subsequent usurious transactions upon it"); *FDIC v. Lattimore Land Corp.*, 656 F.2d 139, 148-49 (5th Cir. 1981) (applying the rule to hold that a bank, as the assignee of the original lender, could enforce a note that was not usurious when made by the original lender because "[t]he non-usurious character of a note should not change when the note changes hands"); *Strike v. Trans-West Discount Corp.*, 92 Cal.App.3d 735, 745 (Cal. Ct. App. 4th Dist. 1979) (an assignee of a bank exempt from usury law was allowed to charge the exempt rate contained in the transferred loan because "a contract, not usurious in its inception, does not become usurious by subsequent events" such as the sale of the note to an assignee).  *See also Tuttle v. Clark*, 4 Conn. 153, 153 (1822) ("not being usurious in its original concoction, [the instrument] did not become so, by the subsequent sale to the plaintiffs").

The valid-when-made rule has withstood the test of time because it is compelled by commercial needs, fundamental fairness, and general principles of contract law.   Lenders often need to transfer loans, and as the Supreme Court explained in allowing an assignee to enforce a valid-when-made rate, a debtor should not be allowed to "be discharged of a debt which he justly owes to someone" simply because the maker of the loan had to sell it.   *Nichols*, 32 U.S. at 110.

Accordingly, the bankruptcy court correctly concluded that because the loan here was non-usurious when the bank made it, it did not become usurious upon its assignment, just as in *Nichols*, *Lattimore*, and *Strike*.   Op. 20-22.   Tellingly, the Debtor's brief in this appeal has no answer to the valid-when-made rule.   This rule governs here no matter what law applies, as this cardinal rule is universal, and is applied "everywhere" (*Nichols*, 32 U.S. at 106).   *See Concord Realty v. Cont'l Funding*, 776 P.2d 1114, 1120 (Colo. 1989) ("the usurious nature of a transaction must be determined from its inception"); *Waggener v. Holt Chew Motor Co.*, 274 P.2d 968, 971 (Colo. 1954) (usury is determined at "the time the loan is made"); *State v. J. C. Penney Co.*, 179 N.W.2d 641, 645 (Wis. 1970) (usury "must exist at the inception of the contract, since a contract which in its inception is unaffected by usury can never be invalidated by any subsequent usurious transaction"); *Hoffman v. Key Federal Sav. and Loan Ass'n*, 416 A.2d 1265, 1269 (Md. 1979) ("[t]he virtually universal rule is that a contract legal at its inception will not be rendered

12

usurious" by subsequent acts); *FDIC v. Tito Castro Constr.*, 548 F. Supp. 1224, 1227 (D.P.R. 1982) ("One of the cardinal rules in the doctrine of usury is that a contract which in its inception is unaffected by usury cannot be invalidated as usurious by subsequent events."); *First Nat'l Bank v. Danek*, 556 P.2d 31, 34 (N.M. 1976) ("[u]sury must exist at the inception of an agreement"); *Highway Equip. & Supply Co. v. Jones*, 153 N.W.2d 859, 863 (Neb. 1967) ("the usurious character of a transaction is determined as of the date of its inception"); *Saul v. Midlantic Nat'l Bank*, 572 A.2d 650, 658 (N.J. App. Div. 1990) ("Under New Jersey law, '[i]t has long been settled that if a note or security is valid when made, no subsequent act can make it usurious'") (citation omitted).[9]

---

[9] *See also Southwest Concrete Prods. v. Gosh Construction Corp.*, 51 Cal.3d 701, 708 (1990) ("a transaction that was not usurious at its inception cannot become usurious by virtue of" a later act); *Rangen, Inc. v. Valley Trout Farms, Inc.*, 658 P.2d 955, 959 (Id. 1983) ("Since the contract at its inception does not require a usurious payment, and it is only because of the customer's [later] voluntary act in failing to make the payment when due that a finance charge is levied, under the applicable law such charge cannot be usurious."); *Coral Gables First Nat. Bank v. Constructors of Fla., Inc.*, 119 So. 2d 741, 746 (Fla. Dist. Ct. App. 1960) ("The general rule followed in this state is that the usurious character of a contract must be determined as of the date of its inception"); *Unity Plan Finance Co. v. Green*, 155 So. 900, 905 (La. 1934) (it is "elementary" that contract must be usurious at inception).

### 2. Under Another Well-Settled Rule, An Assignee Succeeds To All The Assignor's Rights In The Contract, Including The Right To Receive The Interest Rate Agreed Upon In The Contract

Another cardinal rule of contract law mandates the same result.  It is well-settled that an assignee succeeds to all the "rights and remedies possessed by or available to the assignor," and "stands in the shoes of the assignor."  6 Am. Jur. 2d Assignments § 108; *see also, e.g.*, *Dean Witter Reynolds Inc. v. Var. Annuity Life Ins. Co.*, 373 F.3d 1100, 1110 (10th Cir. 2004) (stating that it was long-established that "an assignee stands in the shoes of the assignor").  Under this "stand-in-the-shoes" rule, the non-usurious character of a note would not change when the note changes hands, because the assignee is merely enforcing the rights of the assignor and stands in its shoes.  As the Seventh Circuit held, "the assignee of a debt … is free to charge the same interest rate that the assignor … charged the debtor," even if, unlike the assignor, "the assignee does not have a license that expressly permits the charging of a higher rate."  *Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285, 286, 289 (7th Cir. 2005) (Posner, J.).  It was irrelevant that the assignee himself lacked express statutory permission to charge the higher interest rate.  Rather, the relevant question was whether the *assignors* were authorized to charge that interest.  *Id.* at 289.  If the assignors were authorized to charge it, then "the common law kicked in and gave the assignees the same right, because the common law puts the assignee in the assignor's shoes, whatever the shoe size."  *Id.*

So too here, because the assignor (Bank of Lake Mills) was authorized by federal statute to charge the interest in the Promissory Note, the assignee can enforce the same contractual right, since the law puts the assignee in the assignor's shoes. It is irrelevant whether the assignee has independent statutory authorization to charge the rate at issue. The assignee is merely enforcing the rights of the assignor, and the law "conceptualizes the matter" as if the assignor, not the assignee, "stands before the court." *Dean Witter Reynolds*, 373 F.3d at 1110. This result follows regardless of whether the law applicable to the enforcement of the Note is federal law, Wisconsin law, or Colorado law. Both states (and indeed, all states) recognize this foundational rule of the contract law of assignments. *See Tivoli Ventures, Inc. v. Bumann*, 870 P.2d 1244, 1248 (Colo. 1994) ("As a general principle of common law, an assignee stands in the shoes of the assignor."); *Farmers Acceptance Corp. v. Howard K. Delozier Construction Co.*, 496 P.2d 1016, 1018 (Colo. 1972) ("an assignee of contract rights stands in the shoes of the assignor"); *Gould v. Jackson*, 257 Wis. 110, 113 (1950) (an assignee "stands exactly in the shoes of [the] assignor. [The assignee] succeeds to all of [the assignor's] rights and privileges"); 6 Am. Jur. 2d Assignments § 108 (an assignee "stands in the shoes of the assignor").

The rule has been applied in other analogous contexts involving transfers of federal statutory rights. For example, when acting as receiver, the FDIC's right to transfer to a loan buyer the FDIC's longer federal statute of limitations "has been upheld by nearly every court that has examined the issue." *Tivoli Ventures, Inc.,*

870 P.2d at 1247 (collecting cases).  Courts have allowed this result even if the FDIC's federal statute did not expressly confer the longer limitations right to the assignee itself, but only to the FDIC as receiver.  As the Texas Supreme Court cogently explained, where a federal statute creates a special limitations rule for the FDIC, "[t]he FDIC, as possessor of this right, may transfer it incident to the asset to which the limitations period relates."  *Jackson v. Thweatt*, 883 S.W.2d 171, 175 (Tex. 1994).  "Thus, while the statute alone might not vest any rights in transferees, the statute combined with the common law of assignment does."  *Id.*  So too here, Section 1831d "combined with the common law of assignment" allows the assignee to lawfully charge the interest rate in the Promissory Note.

### 3.  Section 1831d Itself Gives Banks The Power To Assign Their Home-State Rates

Section 1831d itself allows assignees to receive the interest rate agreed to in the loan.  When Congress enacted the earliest predecessor of Section 85, it was already established that the banks' power to make loans carries with it the power to assign those loans.  *Planters' Bank of Miss. v. Sharp*, 47 U.S. 301, 322-23 (1848); *see also* Op. 21 ("This has been an American rule for centuries").  Thus, when banks receive the power to make loans, they also receive the power to assign the loans, even if the power to assign is not expressly mentioned.  *Id.*  As the Supreme Court explained, "in [making] notes and managing its property in legitimate banking business, [a bank] must be able to assign or sell those notes."  *Planters*, 47 U.S. at 323.

Congress enacted DIDA against this legal backdrop, and thus understood that the banks' authority to assign their usury-exempted rates was inherent in their authority to make loans at those rates. Indeed, Congress viewed another DIDA usury exemption (codified as § 1735f-7a) as inherently allowing banks to transfer their usury-exempted interest rates to assignees, even if that exemption did not mention assignees. *See* S. REP. 96-368, 1980 U.S.C.C.A.N. 236, 254-55 (1980) (stating with respect to that DIDA usury exemption that "loans originated under this usury exemption *will not be subject to claims of usury even if they are later sold* to an investor who is not exempt under this section") (emphasis added).

Any other interpretation would defeat the purpose of the statute. As one court explained, if banks cannot transfer their usury-exempted rates (and assignees cannot enforce them), loans sales to the "secondary market" would be "uneconomic," which "would be disastrous in terms of bank operations" because banks need the ability to sell loans in order to properly maintain their capital, liquidity, and ultimately, their safety and soundness. *Strike,* 92 Cal. App. 3d at 745. Thus, to avoid frustrating the purpose of a California provision exempting banks from usury laws, the *Strike* court held that the provision necessarily allowed the bank's assignees to enforce the bank's interest rate even if the language of the provision did not mention assignees. *Id.* (stating that a different interpretation was "not conformable to" the purpose of the banks' exemption). So too here, to avoid frustrating the purpose of Section 1831d, a bank's statutory authority to charge interest at the rate permitted by its home State

must inherently encompass the power to convey that usury-exempted rate to an assignee.[10] *See also Bob Jones Univ. v. U.S.*, 461 U.S. 574, 586 (1983) (it is a "well-established canon of statutory construction" that courts avoid an interpretation that would "defeat [the] plain purpose" of a statute).

As evinced by its plain text, Section 1831d's purpose is to allow banks to fully benefit from the interest rates allowed by their home states. That benefit would be hollow if banks lacked the power to use the originated loans for their usual commercial purposes, including assignment. The power to assign is indispensable in modern commercial transactions,[11] and even more so in banking. Banks need to be able to sell their loans in order to maintain adequate capital and liquidity, and to preserve their financial soundness.[12] As the Supreme Court explained, "in managing its property in legitimate banking business, [a bank] *must be able to assign or sell* those notes when necessary and proper, as, for instance, to procure more [liquidity] in an emergency, or return an unusual amount of deposits withdrawn, or pay large debts." *Planters*, 47 U.S. at 323 (emphasis added).

---

[10] After *Strike* was decided in May 1979, the California exemption at issue was amended to explicitly apply to "successors in interest" of exempt lenders, for loans issued after November 7, 1979.

[11] *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 276 (2008) (assignments are part of the "the pragmatic necessities of trade").

[12] Loan sales and securitizations provide banks with "a useful funding, capital, and risk management tool" by allowing banks "to obtain lower cost funding, diversify [their] funding sources, … and increase [their] ability to manage interest rate risk." FDIC, Credit Card Securitization Manual, Introduction (2007), https://www. fdic.gov/regulations/examinations/credit_card_securitization/ch1.html. Loan sales also help banks maintain safe asset concentration levels. *Id*.

The ability to sell loans is indispensable even to banks that prefer not to "dispose of their notes often," as unexpected needs to pay large debts or "pressures" caused by deposit withdrawals can happen to all banks, and thus all banks must be able to sell loans in order to be able to repay such debts and protect against failure. *Id*. Congress could not have intended to give banks a stunted right that leaves them exposed in such emergencies. *See Franklin Nat'l Bank v. New York*, 347 U.S. 373, 378 (1954) (because a bank needs to be able to advertise in order to grow its deposit business, the bank's statutory right to accept savings deposits implicitly incorporated the right to advertise such deposits, as Congress could not have intended to give banks a stunted right—to merely "permit a national bank to engage in a business but gave no right to let the public know about it").

For these reasons, interpreting the statute in light of its history, purpose and in accordance with traditional principles of statutory construction compels the conclusion that Congress intended to confer on banks a *meaningful* right to make loans at the rates allowed by their home states, which necessarily includes the ability to transfer those rates. And because Section 1831d allows banks to transfer their home-state rates, Section 1831d expressly preempts state restrictions on the assignability of such rates, including restrictions on the assignee's ability to enforce the rates. *See* 12 U.S.C. § 1831d (stating that any "State constitution or statute" that is contrary to Section 1831d "is hereby preempted for the purposes of this section").

Even if Section 1831d did not expressly provide for preemption, a state law that restricts a bank's ability to assign loans made under Section 1831d (including by preventing assignees from enforcing the transferred interest rate) would be preempted under ordinary principles of conflict preemption.[13] As the Supreme Court has repeatedly made clear, state laws that purport to restrict a power conferred by federal banking law are in clear conflict with the federal law and are therefore preempted even if the federal law merely permits, but does not require, the bank to use that federal power. *See, e.g., Fidelity Federal Savings & Loan Assn. v. de la Cuesta*, 458 U. S. 141, 155 (1982) (holding that state law restricting banks' ability to use and enforce due-on-sale clauses conflicted with federal law that allowed such clauses and was therefore preempted, and that "[t]he conflict does not evaporate because the [federal law] simply permits, but does not compel, federal savings and loans to include due-on-sale clauses in their contracts").

Preemption applies even when the power given by the federal statute is implicit, as here. *Franklin*, 347 U.S. at 378 (finding a "clear conflict" between federal law, which authorized national banks to receive savings deposits but did not explicitly permit (much less require) national banks to advertise, and New York law, which forbade them to use the word "savings" in their advertising).

---

[13] Conflict preemption provides an additional basis for preemption even when a statute contains an express preemption clause as here. *Arizona v. U.S.*, 567 U.S. 387, 406 (2012).

## B. The Debtor's Cases Are Inapposite

The Debtor has no answer to the valid-when-made rule, which by itself defeats its usury claim. Instead, the Debtor relies on *Meade v. Avant of Colorado, LLC*, 307 F. Supp. 3d 1134 (D. Colo. 2018), and *Madden v. Midland Funding*, LLC, 786 F.3d 246 (2d Cir. 2015), which do not address the rule.

As the bankruptcy court showed, *Meade* never reached the issues presented here. *Meade* looked at just one question: whether Section 1831d completely preempted state law so as to transform the state-law usury claims asserted by the complaint in that case into federal causes of action and thus give rise to a right of removal to federal court. 307 F. Supp. 3d at 1137. Complete preemption is not a "measure of the breadth of the preemption" but rather involves a situation in which a federal law "substitutes a federal cause of action for the state cause of action," which then permits removal. *Schmeling v. NORDAM*, 97 F.3d 1336, 1339 (10th Cir. 1996). *Meade* expressly acknowledged that its holding on complete preemption has no bearing on the separate defenses of express preemption or conflict preemption and agreed that these two defenses might ultimately defeat the plaintiffs' claims in that case "on the merits." 307 F. Supp. 3d at 1145. *Meade* merely concluded that these two defenses do not give rise to federal question jurisdiction (and thus to a right of removal). *Id*. *Meade* declined to address the merits of those preemption defenses, which it left for the state court to decide on remand. *Id*.

21

The Debtor argues that even if *Meade* expressly declined to address the merits of the two preemption defenses at issue here, *Meade*'s analysis of complete preemption might nevertheless inform the analysis here because *Meade* noted that Section 1831d was silent on the rights of assignees.  But the rights given by a statute need not always be expressly mentioned—they are often implicit in the other rights given by the statute.  Preemption still applies even in such cases.  *See, e.g.*, *Franklin*, 347 U.S. at 378 (preempting state advertising restrictions because the banks' right to advertise was implicit in their right to accept savings deposits, even if the right to advertise was not mentioned in the federal statute at issue).  Here, as discussed in Part B.3 above, the banks' right to assign loans charging their home-state rates is encompassed in their statutory right to make loans at those rates.  Therefore, Section 1831d preempts state laws that restrict the banks' ability to assign (including laws that do so by preventing assignees from enforcing the transferred interest rate).

In any event, the valid-when-made rule and the stand-in-the-shoes rule are not silent on the rights of assignees: as shown above, they give assignees the right to enforce the interest rates charged in the transferred loan.  *Meade* expressly acknowledged that while both of these rules could provide a defense on the merits in that case, it was not addressing any such defenses.  *Id*. at 1152.  Those defenses, the court held, must be presented instead in state court.  *Id*.  Thus, nothing in *Meade* informs this Court's analysis of these two rules, much less precludes affirming the bankruptcy court based on these rules.  The Debtor's reliance on a host of other complete

preemption cases fails for the same reason—none of them considered these two rules, nor whether conflict or express preemption defeats a usury claim on the merits.

The only case cited by the Debtor that does not involve complete preemption is *Madden*. But *Madden* failed to consider the valid-when-made rule and the stand-in-the-shoes rule, either of which defeats the Debtor's usury claim. Because both Colorado and Wisconsin law apply those rules, those rules govern here no matter what law applies to the Promissory Note. The bankruptcy court therefore correctly rejected *Madden* as contrary to the cardinal rules that govern this case. Op. 22 n.57. *Madden*'s disregard of two centuries of established law—without even addressing such law—is not just wrong: it is unfathomable. And it is doubly disconcerting given its negative impact on the credit markets and the banking system. *See, e.g.*, U.S. Dep't of Treasury, Report: A Financial System That Creates Economic Opportunities, Nonbank Financials, Fintech, and Innovation at 92 (July 2018) (explaining that *Madden* was wrongly decided and has the effect of "restricting access to credit").[14]

*Madden* also erred in concluding that state law did not conflict with federal law because state law did not actually prohibit *banks* from assigning loans but merely prohibited *assignees* from enforcing the interest rate in the loans. *Madden*, 786 F.3d at 251 (finding no preemption because "state usury laws would not prevent consumer debt sales by national banks" but "limit[] only activities" of the assignees).

---

[14] Available at https://home.treasury.gov/sites/default/files/2018-07/A-Financial-System-that-Creates-Economic-Opportunities---Nonbank-Financi....pdf.

*Madden*'s idea that a bank is not prevented from assigning when its assignees are not allowed to enforce the transferred interest rate blinks reality: if the interest rate is not enforceable upon assignment, there is nothing for the bank to assign. Section 1831d gives banks a right to transfer their home-state rates, not a right to transfer "zero." Thus, as the Solicitor General of the United States and the OCC also explained, *Madden* is wrong because a state law that prohibits assignees from enforcing the transferred rates actually makes the *banks'* rights to transfer those interest rates non-assignable in practice.[15] That state law is therefore preempted because it is contrary to Section 85 and Section 1831d, which, as discussed above, allow banks to transfer their rates to assignees.

## CONCLUSION

For the foregoing three reasons, the decision of the bankruptcy court should be affirmed. Affirmance would preserve the banks' longstanding ability to engage in loan sales, would reaffirm the traditional protections that such loan sales have received under the law, would ensure the proper functioning of the credit markets, and would promote safety and soundness in the banking sector by supporting loan sales and securitizations, which are used to manage capital and liquidity positions.

---

[15] Brief for the United States as Amicus Curiae in *Madden*, 2016 WL 2997343 at *12 (2016).

Respectfully submitted,

NICHOLAS J. PODSIADLY
General Counsel
FLOYD I. ROBINSON
Deputy General Counsel
COLLEEN J. BOLES
Assistant General Counsel
J. SCOTT WATSON
Senior Counsel

s/ Minodora D. Vancea
MINODORA D. VANCEA
Counsel
Federal Deposit Insurance Corporation
3501 Fairfax Drive, VS-D7176
Arlington, VA 22226-3500
(703) 562-2049
mvancea@fdic.gov
*Counsel for the FDIC*


JONATHAN V. GOULD
Senior Deputy Comptroller and
Chief Counsel
BAO NGUYEN
Principal Deputy Chief Counsel
GREGORY F. TAYLOR
Director of Litigation
MICHAEL K. MORELLI
Office of the Comptroller of the Currency
400 7th Street S.W.
Washington, D.C. 20219
*Counsel for the OCC*

## CERTIFICATE OF COMPLIANCE

This amicus brief complies with the type-volume limitation of Rule 8017(a)(5) (and 8015(a)(7)(B)) because it contains 6,495 words, excluding the parts of the brief exempted by Rule 8015(a)(7)(B)(iii).

Dated this 10th day of September, 2019.

s/ Minodora D. Vancea
Minodora D. Vancea
*Counsel for FDIC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of September, 2019, I electronically filed the foregoing amicus brief with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses:

pjones@wth-law.com

pvellone@allen-vellone.com

mark@larsonlawyer.com

<u> s/ Minodora D. Vancea</u>
Minodora D. Vancea
Counsel for FDIC