UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RAMANJEET KAUR, KULWINDER SINGH UPPAL, AND NEW ENGLAND DISTRIBUTORS, INC.<br><br>    Plaintiffs,<br><br>v.<br><br><br>WORLD BUSINESS LENDERS, LLC, WBO SPL I, LLC, AXOS BANK, AND ATLANTIS CAPITAL, LLC<br><br>    Defendants | CIVIL ACTION<br>NO. 19-11364-WGY |

Young, D.J.                                          February 24, 2020

### MEMORANDUM & ORDER

## I.   INTRODUCTION

As the plaintiff borrowers frame this case:

> This case stands at the intersection of two dangerous trends in the marketing of financial products: (1) placing a home at risk by issuing a financial product doomed to fail; and (2) "rent-a-bank" or "rent-a-charter" schemes in which the identity of a true lender is obscured, and a loan placed in the name of a federally chartered bank, as a dodge around state usury laws or other state law requirements.

Notice Removal, Ex. A, Compl. ¶ 2, ECF No. 1-1.

In essence, the defendant lenders say, "So what?"

Nationally chartered banks are exempt from state usury laws and

can assign their loans (for a fee) to private lenders who can

thus avoid state usury laws as well.   Moreover, here in
Massachusetts, our usury laws are essentially meaningless,
because they need not be followed by registered predatory
lenders.   <u>See</u> Mem. Supp. Mot. Dismiss ("Defs.' Mem.") 3, 5, ECF
No. 11.   The difficulty in this case is that both
characterizations are correct.   What, then, is left for this
Court to do in ruling on this motion to dismiss?

Let's see.

A married couple, Ramanjeet Kaur and Kulwinder Singh Uppal,
took out a loan for Uppal's small business, New England
Distributors, Inc. (collectively "Borrowers"), from World
Business Lenders, LLC ("World Business") and Axos Bank, formerly
known as "Bank of the Internet"("BofI Federal Bank")
(collectively "Lenders"), with an annual percentage rate
interest in excess of 92%.   Kaur and Uppal used their residence
at 9-11 Upland Park, Somerville, Massachusetts, as collateral
for the personal guaranty-backed business loan.   After the
couple fell into arrears on the business loan payments, World
Business initiated foreclosure proceedings on their home.
Borrowers allege that World Business engaged in usury in a
business loan transaction in violation of Massachusetts General
Laws chapter 271, section 49(a).   Borrowers also claim that BofI
Federal Bank aided in World Business's usury in violation of
section 49(a).   Finally, the Borrowers claim that World Business

and BofI Federal Bank engaged in two forms of unfair and
deceptive business practices: (1) issuing a business loan to the
Borrowers that was "doomed to fail" in violation of
Massachusetts General Laws chapter 93A and (2) a "rent-a-bank"
scheme.  In light of the alleged counts, Borrowers request a
permanent injunction against foreclosure proceedings upon the
Kaur-Uppal home.  World Business seeks to dismiss the complaint.

## A.   Procedural History

On April 12, 2019, the Borrowers filed a complaint and
demand for jury trial (the "Complaint") in the Superior Court
sitting in and for the County of Middlesex, Massachusetts (the
"Superior Court").  State Ct R. 23-48 ("Compl."), ECF No. 6.  On
June 19, 2019, Lenders removed the case to federal court.  28
U.S.C. §§ 1331, 1332, 1441, 1446; Notice Removal 2, 4, ECF No.
1.

On August 16, 2019, Lenders filed a motion to dismiss for
failure to state a claim.  Mot. Dismiss, ECF No. 10; Defs.' Mem.
1, 4-5.  The parties fully briefed the issue.  Pls.' Opp'n Mot.
Dismiss ("Pls.' Opp'n"), ECF No. 15; Reply Resp. Mot. Dismiss
(Defs.' Reply), ECF No. 19.

A hearing on the motion to dismiss was held on October 17,
2019, after which the Court took the matter under advisement.
Electronic Clerk's Notes, ECF No. 21.

### B.   Alleged Facts

The Plaintiffs, Uppal and Kaur, reside at 9-11 Upland Park, Somerville, Massachusetts.  Compl. ¶¶ 6-7.  Uppal owns a business, New England Distributors, Inc. ("New England Distributors"), which is located at 12 Linscott Road, Unit F, Woburn, Massachusetts.  Id. ¶¶ 7, 8.  In February and March of 2018, Uppal and Kaur contacted Atlantis Capital, LLC ("Atlantis"), a New York City-based broker that refers clients to loan agencies, to inquire about a business loan for New England Distributors.  Id. ¶¶ 1, 13, 23.  Atlantis requested several months of New England Distributors' bank statements, New England Distributors' merchant processing statements, and information from New England Distributors concerning outstanding company debt.  Id. ¶¶ 25-29. Atlantis then referred the Borrowers to World Business.  Id.

Uppal and Kaur submitted additional documentation to World Business, followed by a business loan application on March 13, 2018.  Id. ¶¶ 30, 34.  They agreed to borrow $175,000 at World Business's lending terms of 92.5867% annual percentage rate ("APR"), which amounts to a daily interest rate of 0.250136986301%, to be paid every business day over a period of nine months.  Id. ¶¶ 33, 43-45.

The loan application that Borrowers signed had letterhead that included the names and business logos of both World

[4]

Business and BofI Federal Bank. Id. ¶ 99. Lenders informed Borrowers that either World Business or BofI Federal Bank (currently known as Axos Bank, an FDIC lending institution located in Las Vegas, Nevada), would act as the final lender. Id. ¶¶ 11-12, 37. BofI Federal Bank then provided a "Business Loan Application" and "Business Loan Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits)," to Borrowers listing. Both forms have the BofI Federal Bank logo at the top, though the Application also has the World Business Lenders logo. Id. ¶¶ 99, 106.

Dispersal of the loan occurred on March 16, 2018. Id. ¶ 51. Starting on March 19, 2018, automatic withdrawals began from the account. Id. ¶¶ 54-55. On the first day, this automatic withdrawal was sent to "CCD DEBIT, BOFI AUTOPAY," but beginning on March 20, and on all subsequent days, this automatic withdrawal listed "WBL" or "WORLD BUSINESS" as the source. Id. ¶¶ 55-58.

Borrowers eventually defaulted on the loan and received a "Notice of Default and Intent to Foreclose" on their residence dated October 1, 2018. Id. ¶ 136. World Business was the holder of their mortgage as of October 1, 2018. Id. ¶¶ 132-133.

Based on these facts, Borrowers allege that World Business was the "true lender" of the loan, Id. ¶¶ 60-95, and that World

Business and BofI Federal Bank were together engaged in a "rent-a-bank" scheme. Id. ¶¶ 156-162.

In addition to the facts in the complaint, Borrowers point to complaints filed in the Southern District of New York and the Middle District of Florida against World Business alleging similar arrangements with other banks. See Id. ¶¶ 96-127 (citing Complaint, B&S Medical Supply, Inc., N.Y. v. World Business Lenders, LLC, Civ. A. No. 17-03234-RMB (S.D.N.Y. 2017), ECF No. 9; Complaint, DeRamo v. World Business Lenders, LLC, Civ. A. No. 17-01435-RAL-MAP (M.D. Fla. 2017), ECF No. 2).

Borrowers brought legal action against World Business Lenders and BofI Federal Bank in the Superior Court on April 12, 2019. Compl., Ex. 1, Civil Action Cover Sheet, ECF No. 1-3. Atlantis was not served in this action. Borrowers seek permanent injunctive relief from World Business and BofI Federal Bank to prevent foreclosure against Kaur's and Uppal's home. Id. ¶ 139 (count I). Furthermore, Borrowers request that the Court order all Defendants to repay the principal, interest, and related fees connected with the allegedly usurious loans, as well as threefold damages, attorneys' fees, and punitive damages pursuant to the Massachusetts consumer protection law, Mass.

Gen. L. ch. 93A, § 2(a), and the Massachusetts usury law, Mass. Gen. L. ch. 271, § 49(a). Id. ¶ 176.

## II.  LEGAL FRAMEWORK

### A.   Standard of Review

In order to survive a motion to dismiss, a complaint must "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A claim must contain sufficient factual allegations, accepted as true, to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The Court must "draw every reasonable inference" in favor of the plaintiff. Berezin v. Regency Sav. Bank, 234 F.3d 68, 70 (1st Cir. 2000). "If the facts in the complaint are sufficient to state a cause of action, a motion to dismiss the complaint must be denied." Kozaryn v. Ocwen Loan Servicing, LLC, 784 F. Supp. 2d 100, 101-02 (D. Mass. 2011) (Gorton, J.).

### B.   Choice of Law

Massachusetts choice-of-law rules apply because this Court sits in Massachusetts. See, Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). Where the parties entering into a loan transaction "have expressed a specific intent as to the governing law, Massachusetts courts will uphold the parties' choice as long as the result is not contrary to public policy." Oxford Global Res., LLC v. Hernandez, 480 Mass. 462, 468, 106

N.E.3d 556 (2018) (quoting Hodas v. Morin, 442 Mass. 544, 549–50, 814 N.E.2d 320 (2004)).  Massachusetts policy reflects the choice of law principals of the Restatement (Second) of Conflict of Laws § 187(2), which presumes that the parties' choice of law applies unless:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) where application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement § 187(2).  Even when a contract includes a choice of law provision, that provision controls only claims based on the terms of the contract, not the underlying validity of the contract's formation.  Northeast Data Sys. v. McDonnell Douglas Computer Sys., 986 F.2d 607, 611 (1st Cir. 1993).

The loan agreement signed by all parties states that Nevada law governs the "legality, enforceability and interpretation of this Agreement and the amounts contracted for."  Pls.' Opp'n, Ex. C, Conditional Closing Agreement ¶ 16(c), ECF No. 15-3.  Borrowers have argued that because the contract is one of adhesion and deceptive on its face, the choice of law provision cannot be enforced.  Compl. ¶¶ 128-131.

Massachusetts law would apply to each of Counts II-VI, but not because it is a contract of adhesion.  Counts II and III, in which Borrowers argue that the loan was inherently unfair and deceptive, impugn the underlying validity of the contract. Regarding count II, Borrowers argue that the loan was made in an unconscionable manner, see Compl. ¶¶ 140-155, an argument that, if successful, could render part or all of the contract unenforceable.  See Drakopoulos v. United States Bank Nat'l Ass'n, 465 Mass. 775, , 788 n.18 991 N.E.2d 1086 (2013). Regarding count III, Borrowers allege that Lenders are engaged in a "rent-a-bank" scheme that is inherently deceptive.  Compl. ¶¶ 156-62.  Both allegations go to the underlying validity of the contracts.  A claim that goes to "the validity of the formation of the contract . . . cannot be categorized as one involving the rights or obligations arising under the contract," and thus "the claim falls outside the contract's choice-of-law provision."  Northeast Data Sys., 986 F.2d at 611 (emphasis in original); accord Plastic Surgery Assocs., S.C. v. Cynosure, Inc., 407 F. Supp. 3d 59, 78 (D. Mass. 2019) (Casper, J.). Counts II and III are therefore governed by Massachusetts law.

Regarding Counts IV, V, and VI, the choice of law provision does not govern the maximum rate of usury because the usury cap represents a "fundamental policy" of Massachusetts.  See Restatement § 187(2)(b).  The Commonwealth of Massachusetts is

where the Borrowers lived when they signed the loan agreement, and where their residence is located. Compl. ¶¶ 6-7. Neither party has alleged that any significant actions in this case occurred in Nevada, so Massachusetts has a "materially greater interest" in the case than Nevada. See Auctus Fund, LLC v. Sunstock, Inc., 405 F. Supp. 3d 218, 227-31 (D. Mass. 2018). Massachusetts has a strong public policy interest in protecting relatively powerless individuals from predatory loans by large lending institutions. This Court has ruled that this interest supersedes choice of law provisions in contracts that provide for rates higher than the Massachusetts cap. See Greenwood Trust Co. v. Mass., 776 F. Supp. 21, 41-42 (D. Mass. 1991) rev'd on other grounds, Greenwood Trust Co. v. Mass., 971 F.2d 818 (1st Cir. 1992)). See also Auctus Fund, LLC, 405 F. Supp. 3d at 227. The registration requirement set forth in Section 49a reflects the Commonwealth's strong public policy interest in inspecting and regulating lenders. See Begelfer v. Najarian, 381 Mass. 177, 182, 409 N.E.2d 167 (1980) ("The law is designed to protect the necessitous debtor from outrageous demands by lenders."). The Massachusetts usury law would only apply, however, to the extent that it is not preempted by federal law. See Greenwood Trust Co., 971 F.2d at 828.

In conclusion, Massachusetts law governs counts II-V, except where preempted by federal law.

### C.   Federal Preemption

State regulations attempting to constrain a federally chartered bank that conducts business within that state are subject to federal preemption.  See Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S. 25, 33 (1996); McClellan v. Chipman, 164 U.S. 347, 349–57 (1896).  Where an "express conflict" exists in the regulation of lending transactions, state law yields to federal law.  Id.  Federal statutes and regulations may also preempt state law by implication when they are pervasive within an area of law to the extent it is clear Congress intended them to predominate.  Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 152–53 (1982).

As a result of these principles of preemption, federally chartered banks insured by the Federal Deposit Insurance Corporation (FDIC) are exempt from state usury laws.  See 12 U.S.C. § 1463(g); Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 11 (2003) ("[T]here is, in short, no such thing as a state-law claim of usury against a national bank."); Yeomalakis v. FDIC, 562 F.3d 56, 59 (1st Cir. 2009).

### D.   Massachusetts Usury Law

The Massachusetts law against usury creates an annual interest rate cap of 20%, beyond which one is "guilty of criminal usury."  Mass. Gen. Laws. ch. 271, § 49(a).  The Massachusetts Legislature hobbled the state usury law upon its

passage in 1970, however, by including language that states, in relevant part:

> [The usury cap] shall not apply to any person who notifies the attorney general of his intent to engage in a transaction or transactions . . . providing any such person maintains records of any such transaction. Such notification shall be valid for a two year period and shall contain the person's name and accurate address.

Id. § 49(d); see also Begelfer, 381 Mass. at 181-82 (discussing legislative history of usury laws in Massachusetts).

### E.  Unfair and Deceptive Business Practices

Massachusetts law bans "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a). Whether an act is "unfair" in violation of chapter 93A depends upon: "(1) whether the practice is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." Hanrahran v. Specialized Loan Servicing, LLC, 54 F. Supp. 3d 149, 154 (D. Mass. 2014) (Saris, J.) (quoting Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 69 (1st Cir. 2009), decision clarified on denial of reh'g, 559 F.3d 1 (1st Cir. 2009)). "To be held unfair or deceptive under c. 93A, practices involving even worldly-wise business people do not

have to attain the antiheroic proportions of immoral, unethical, oppressive, or unscrupulous conduct, but need only be within any recognized or established common law or statutory concept of unfairness." VMark Software, Inc. v. EMC Corp., 37 Mass. App. Ct. 610, 620, 642 N.E.2d 587 (1994).

**F.   The Rent-a-Bank Problem**

Although many banking partnership arrangements are fair and lawful, "rent-a-bank" schemes are notable for charging exorbitant interest rates and engaging in potentially predatory lending practices. See generally Complaint, NRO Bos., LLC & Indelicato v. Kabbage, Inc., Civ. A. No. 17-11976-GAO, 2017 WL 4569540 (D. Mass. Oct. 12, 2017); Petition to Vacate Arbitration Award, NRO Bos., LLC v. Kabbage, Inc., Civ. A. No. 19-11901-GAO (D. Mass. Sept. 9, 2019), ECF No. 1.[1]

---

[1] The case of Kabbage, Inc. is one of many examples of large companies hiding behind forced arbitration provisions to avoid the court system. See Petition to Vacate Arbitration Award ¶ 112, Kabbage, Inc., supra. In that case, a court was never able to evaluate whether the plaintiff's claims of an unlawful rent-a-bank scheme were meritorious, because the defendant successfully compelled arbitration. Id. ¶¶ 105-109. This is a common phenomenon. The Consumer Finance Protection Bureau has found that many large companies, particularly in the financial sector, habitually include arbitration provisions in their routine service contracts, ensuring that any consumer doing business with them must go through arbitration instead of the court system. See Consumer Fin. Prot. Bureau, Arbitration Study: Report to Congress 9-18 (Mar. 2015), available at https://files.consumerfinance.gov/f/201503_cfpb_arbitration-study-report-to-congress-2015.pdf.

Brick-and-mortar or online rent-a-bank schemes charging up to 160% in interest have become more prevalent in recent years. Chris Arnold, How Some Online Lenders Dodge State Laws to Charge Triple Digit Interest Rates, National Public Radio (November 12, 2019), https://www.npr.org/2019/11/12/778632599/how-some-online-lenders-dodge-state-laws-to-charge-triple-digit-interest-rates. While high-interest loans can provide a legitimate service by granting credit to under-served consumers, in practice, high-interest loans often trap borrowers in endless cycles of debt, in which they either default or pay far more in interest than the original principal. See Consumer Fin. Prot. Bureau, Payday Loans and Deposit Advance Products 43-45 (April 2013), available at https://files.consumerfinance.gov/f/201304_cfpb_payday-dap-whitepaper.pdf.

Put simply, rent-a-bank operations allow non-bank lenders to borrow FDIC-insured banks' federal preemption. In a typical rent-a-bank arrangement, a non-bank lender will market, fund, and collect on a loan, while a partnered nationally charted bank (or Native American tribe) benefitting from federal preemption will formally underwrite and originate the loan on paper. See, e.g., Pennsylvania v. Think Fin., Inc., No. 14-cv-7139, 2016 U.S. Dist. LEXIS 4649 at *3, *72 (E.D. Pa. Jan. 14, 2016) (describing "rent-a-bank" and a "rent-a-tribe" arrangements and holding that plaintiffs had plausibly claimed the arrangement

was designed to evade Pennsylvania law).[2] The bank or tribe then typically assigns the loan to the non-bank lender.  See Id. at *38-39.

Courts in various circuits have disagreed as to whether the "true lender" in these cases should factor into the analysis. Courts that have ruled rent-a-bank arrangements lawful have held that if loans are "valid-when-made" they are not rendered invalid by subsequent assignment.  See, e.g., Sawyer v. Bill Me Later, Inc., 23 F. Supp. 3d 1359, 1367 (D. Utah 2014); In re Rent-Rite Superkegs W., Ltd. 603 B.R. 41, 66 (Bankr. D. Colo. 2019).  The Second Circuit, in contrast, has ruled that federal preemption may not apply to an assignee of a national bank.  See Madden v. Midland Funding, LLC, 786 F.3d 246, 250-51 (2d Cir. 2015) (ruling that assignee of loan from a national bank was subject to state usury law).  Other courts have allowed usury claims to go forward for alleged rent-a-bank schemes when the non-bank lender was the "true lender," rather than the bank.

---

    [2] A series of court cases holding that "rent-a-tribe" schemes violated state law may have had a part in leading to the resurgence of "rent-a-bank" arrangements in recent years, after their decline in the late 2000s.  See Pl.'s Opp'n, Ex. F, Letter from Attorney General Karl A. Racine et. al. to Secretary Robert E. Feldman, Request for Information on Small-Dollar Lending 4 n.16 (Jan. 22, 2019), available at https://oag.dc.gov/sites/default/files/2019-01/FDIC-Small-Dollar-Lending-Letter.pdf, (citing, e.g., MacDonald v. CashCall, Inc., Civ. A. No. 16-2781, 2017 WL 1536427, at *3 (D.N.J. Apr. 28, 2017), aff'd, 883 F.3d 220 (3d Cir. 2018)) ("AG Letter"), ECF No. 15-7.

See, e.g., West Virginia v. CashCall, Inc., 605 F. Supp. 2d 781, 787-88 (S.D. W. Va. 2009); Meade v. Marlette Funding, LLC, No. 17-cv-00575-PAB-MJW, 2018 WL 1417706 at *3-4 (D. Colo. Mar. 21, 2018). No Massachusetts court has yet ruled on this issue.

Responding to the problem of rent-a-bank and rent-a-tribe arrangements designed to evade state usury laws, in January 2019 fourteen state Attorneys General signed a letter from the Massachusetts Attorney General to the FDIC asking that it discourage banks from entering into relationship with non-bank lenders for the purpose of high-interest lending. See AG Letter cited supra note 2.

## III. Analysis

### A.   No Massachusetts Appellate Decisional Law

The Lenders advance the remarkable argument that, because no Massachusetts appellate court has addressed rent-a-bank arrangements, the issue is beyond this Court's purview. See Defs.' Reply at 2. This is a specious argument.[3] It is

---

[3] Indeed, this argument would be laughable were it not for the fact Congress itself has endorsed it in another context by limiting the writ of habeas corpus in the Anti-Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d)(1) (AEDPA) (disallowing the grant of the writ unless the Supreme Court itself has already spoken to the issue). This restriction upon the exercise by lower courts of judicial authority raises significant constitutional issues. See Irons v. Carey, 479 F. 3d 658, 668-69 (9th Cir. 2007) (Noonan, J., concurring).

In any event, no such restriction exists in this case.

certainly within the subject matter jurisdiction of this Court,
sitting in diversity, to address the issues presented in light
of the Massachusetts laws regulating usury and Massachusetts'
general consumer protection law. Mass. Gen. Laws ch. 93A, § 2.[4]

### B.   Claims for Violation of Usury Laws

As the usury analysis has a significant impact on the
Borrowers' chapter 93A claims, the Court will address these
claims first.  The Borrowers contend in count IV that World
Business engaged in usury in violation of Massachusetts law
because it is the "true lender" and charged an interest rate
well over 20% on a loan without proper documentation.  Compl. ¶¶
163-172.  Accordingly, they also allege BofI Federal Bank and
Atlantis Capital aided usury.  Id. ¶¶ 173-174.  Finally, the
Borrowers contend that the Lenders violated chapter 93A, as a
usury violation constitutes per se unfair and deceptive business
practices.  Id. at ¶¶ 175-176.  See In re Tavares, 298 B.R. 195,
203 (Bankr. D. Mass. 2003).

---

[4] The Court has no quarrel with the recent pronouncement of
the First Circuit that "[f]ederal courts are not free to extend
the reach of state law . . . and must exercise considerable
caution when even considering the adoption of a new
application." Doe v. Trustees of Boston College, 942 F.3d 527,
535 (1st Cir. 2019) (citing Doyle v. Hasbro, Inc., 103 F.3d 186,
192 (1st Cir. 1996)).  Caution is quite distinct from
abdication, and the Court does not read the First Circuit's
opinions to command AEDPA-like paralysis when confronted with a
question of state law not definitively answered by the courts of
the Commonwealth.  The statutory language and existing state
court decisions supply ample law for this Court to apply.

The Lenders argue that the Borrowers do not have a
cognizable argument for usury because Massachusetts does not
recognize any kind of "true lender" doctrine, and therefore any
claims for usury against World Business would be barred by
federal preemption.  Defs.' Mem. 5-7.  They further raise a
factual challenge concerning whether World Business would be the
"true lender" if this Court were to use that test.  Id. at 7-8.
Finally, they note that World Business may exceed the
Massachusetts usury cap at will because it has registered with
the state Attorney General in accordance with Massachusetts
General Laws chapter 271, section 49(d).  Id. at 9-10 (citing
id., Ex. A, Notification Pursuant to Mass. Gen. Laws ch. 271, §
49(d) (Aug. 15, 2017), ECF No. 11-1).

### 1. Determining the True Lender

Both parties extensively briefed the question of whether
the identity of the "true lender" is legally significant.  See
Defs.' Mem. 5-8, Pls.' Opp'n 6-13, Defs.' Reply 5-7.
Massachusetts law has not settled on which of the two dominant
theories to apply in alleged rent-a-bank cases: the "valid when
made" theory or the "true lender" theory.

Under the "valid when made" doctrine, "if the interest rate
in the original loan agreement was non-usurious, the loan cannot
become usurious upon assignment —— so, the assignee lawfully may
charge interest at the original rate."  In re Rent-Rite

Superkegs W., Ltd., 603 B.R. at 66.  This theory is based on long-standing case-law holding that a loan cannot become usurious due to subsequent assignment.  See Gaither v. Farmers' & Mechs. Bank of Georgetown, 26 U.S. (1 Pet.) 37, 43 (1828) ("[I]f the note [is] free from usury, in its origin, no subsequent usurious transactions respecting it, can affect it with the taint of usury."); Phipps v. FDIC, 417 F.3d 1006, 1013 (8th Cir. 2005) ("Courts must look at 'the originating entity (the bank), and not the ongoing assignee. . . in determining whether the [National Banking Act] applies.'") (ellipsis in original) (quoting Krispin v. May Dep't Stores Co., 218 F.3d 919, 924 (8th Cir. 2000)).  It is less clear, however, that the holdings in these cases foreclose courts from investigating the creation of the loan, as they concern types of transactions distinguishable from modern rent-a-bank operations.  See generally Amicus Curiae Brief of Professor Adam J. Levitin in Support of Appellant, Rent-Rite Superkegs W., Ltd. v. World Business Lenders, LLC, No. 19-cv-01552 (D. Colo. Sept. 19, 2019).

The "valid when made" doctrine has been hotly contested in light of the Second Circuit's 2015 ruling in Madden, which declined to apply it in a federal preemption case.  786 F.3d at 250-51.  The federal government in recent years has supported the doctrine and filed an amicus brief in Rent-Rite defending

it.  See Amicus Brief of the Federal Deposit Insurance
Corporation and the Office of the Comptroller of the Currency in
Support of Affirmance and Appellee, Rent-Rite, No. 19-cv-01552
(D. Colo. Sept. 10, 2019).  The Office of the Comptroller of the
Currency is also considering regulation to codify the doctrine
as federal law.  See Permissible Interest on Loans That Are
Sold, Assigned, or Otherwise Transferred, 84 Fed. Reg. 64229
(Nov. 21, 2019) (to be codified at 12 C.F.R. pts. 7, 160).
Until the federal government takes formal action, however,
"valid when made" remains only one of two common
interpretations, rather than settled doctrine.

The second doctrine that courts have applied is the "true
lender" theory.  If the national bank is not the "true lender,"
some courts have ruled, the partner non-bank entity does not
gain the benefit of federal preemption.  In determining the true
lender, courts have looked to which institution had the
"predominant economic interest," for which "[t]he key and most
determinative factor" is which entity "placed its own money at
risk at any time during the transactions."  Consumer Fin. Prot.
Bureau v. CashCall, Inc., No. 15-7522-JFW (RAOx), 2016 WL
4820635, at *6 (C.D. Cal. Aug. 31, 2016).  Courts have also
looked to the circumstances surrounding the loan application,
such as how borrowers applied and the time between the
completion of loan application and assignment to the non-bank

entity.  See Meade, 2018 WL 1417706, at *3; Meade v. Avant of Colorado, LLC, 307 F. Supp. 3d 1134, 1148-49 (D. Colo. 2018). Utilizing this doctrine, several courts have held that complete preemption does not apply to rent-a-bank or rent-a-tribe arrangements.  See CashCall, 605 F. Supp. 2d at 787-88; Pennsylvania v. Think Fin., Civ. A. No. 14-7139, 2016 WL 183289 at *11 (E.D. Pa. Jan. 14, 2016); Meade, 2018 WL 1417706, at *3.

The Lenders argue, correctly, that Massachusetts appellate courts have not considered the true lender doctrine.  Defs.' Reply 5-6.  Though there have been two recent cases concerning rent-a-bank or rent-a-tribe arrangements in Massachusetts, neither reached a precedential decision on the merits in court. See Final Judgment by Consent, CashCall, Inc. v. Mass. Div. of Banks, No. SUCV2013-01616-B & SUCV-2013-01641-B (Mass. Super. Ct. Oct. 26, 2015) (ending in a consent decree); Kabbage, Inc., Civ. A. No. 19-11901-GAO (ending in forced arbitration).

Accordingly, this is an issue of first impression in this Court under Massachusetts law.  It is highly likely these issues will arise again in the Massachusetts judicial system.  Because the issues at hand in this case may be decided based on an analysis of the Massachusetts usury law, however, this Court declines to weigh in on the true lender doctrine, and instead turns to Lenders' separate, viable defense against the three usury claims.

### 2.   Defense to Usury

Borrowers' claims of usury against both World Business and BofI Federal Bank cannot survive because World Business has registered with the State Attorney General in accordance with Massachusetts General Laws. ch. 271, § 49(d).

As explained above, under Massachusetts' toothless usury laws, a lending institution may avoid the 20% cap by registering with the Massachusetts Attorney General's office.   World Business did exactly this, submitting written notification of its intent within two years of making this loan.   Defs.' Mem., Ex. A, Notification Pursuant to Mass. Gen. Laws ch. 271, § 49(d) (Aug. 15, 2017), ECF No. 11-1.   This case is thus distinguishable from the consolidated Cashcall cases, where lenders agreed to a consent decree for charges of usury and violations of chapter 93A; in those cases, the borrowers failed to register with the Attorney General's office.   See Final Judgment by Consent, CashCall, Inc. v. Mass. Div. of Banks, supra.   Counts V and VI of the present complaint are both dependent on an underlying usury violation, and so they must fall as well.

The Borrowers argue that the Lenders failed to register properly with the State because their registration records indicate that BofI Federal Bank was the lender, rather than World Business.   Pls.' Opp'n 17-19.   The Lenders note that the

language of Section 49(d) does not require the name of the
lender, but only the borrower's information. Defs.' Reply 8.
See also Mass. Gen. Laws. ch. 271, § 49(d)) ("Such records shall
contain the name and address of the borrower, the amount
borrowed, the interest and expenses to be paid by the borrower,
the date the loan is made and the date or dates on which any
payment is due.")  Though the Borrowers are correct that the
purpose of these regulations is to allow for criminal
enforcement, the Lenders are correct that listing the bank
lender rather than non-bank lender on World Business's own
internal documents does not render those records inherently
inaccurate, or so confusing as to foil government attempts at
enforcement.  See Pls.' Opp'n 15; Defs.' Reply 8.  The Lenders
have therefore kept records that conform to the statute.

In sum, as interesting as the legal issues surrounding the
true lender doctrine are, the Lenders are correct that their
registration with the Attorney General "dooms the Complaint"
with respect to the usury claims.  Defs.' Mem. 9.  Accordingly,
this Court will refrain from embarking into this unsettled area
of law and GRANTS the motion to dismiss the counts based on
violations of the Massachusetts usury law, counts IV, V, and VI.

### C.  Claims for Violation of Chapter 93A

The Borrowers claim that World Business and BofI Federal
Bank have violated Massachusetts General Laws chapter 93A,

section 2 on two different theories, corresponding with counts II and III of their Complaint.  Compl. ¶¶ 140-162.  Only one succeeds.

### 1.   Chapter 93A: Rent-a-Bank

The Borrowers have alleged sufficient facts to permit the inference that World Business and BofI Federal Bank may have been collectively engaged in a "rent-a-bank" scheme designed to circumvent Massachusetts law, but that is different from pleading a cause of action.  The Borrowers have not pled that any inaccuracies in the loan transaction caused them any injury.  They have therefore failed to plead sufficiently the elements of a chapter 93A violation on the face of their complaint.

For a consumer to plead a chapter 93A violation under a theory of deception, she must show not only that a deception occurred, but also that the deception caused some kind of injury distinct from the deception itself.  See Shaulis v. Nordstrom, Inc., 865 F.3d 1, 7-10 (1st Cir. 2017); Tyler v. Michaels Stores, Inc., 464 Mass. 492, 503, 984 N.E.2d 737 (2013) (explaining that a chapter 93A claim can arise from non-economic injury, but that the plaintiff must allege that the underlying deception "cause[d] the consumer some kind of separate, identifiable harm arising from the violation itself").

Borrowers have alleged that BofI Federal Bank and World Business were engaged in obfuscating the true source of the

business loan on the loan documents themselves, based on the
fact that the Conditional Closing Agreement lists only BofI
Federal Bank as the lender, with World Business identified as
the "[s]ervicer," even though World Business marketed the loan
and was its eventual assignee.  See Pls.' Opp'n, Ex. C,
Conditional Closing Agreement 31.  The Borrowers have also
alleged that World Business may have been the "true lender."
See Compl. ¶¶ 60-95.  Whether or not a reasonable jury could
find this arrangement to be deceptive, it is not enough for the
Borrowers merely to allege that the contract contained a
deception.  Even if this Court were to examine the transaction
through the lens of the true lender doctrine, the Borrowers must
also show some sort of injury separate from the underlying
deception.  Tyler, 464 Mass. at 503.  The language of the
complaint does not describe any causal nexus between the alleged
deception and the Borrower's injury.  See Compl. ¶¶ 156-162.
The Borrowers' alleged injury appears to be based on the terms
of the loan and the Lenders' decision-making surrounding the
contract, not the labelling of each party in the loan documents.
In short, there is no cognizable chapter 93A claim on a
deception theory when, as here, the plaintiffs "received
everything they had bargained for."  Shaulis, 865 F.3d at 11.

2.    **Chapter 93A: Doomed to Fail**

The Borrowers have alleged sufficient facts to permit the inference that the business loan may have been "doomed to fail," in violation of chapter 93A, section 2.

The Massachusetts doctrine concerning loans that are "doomed to fail" has evolved largely in the context of home mortgage loans.  In Commonwealth v. Fremont Inv. & Loan, the Supreme Judicial Court held that a "high-cost home mortgage loan" violates chapter 93A unless the lender "reasonably believes" the borrower could repay, looking to four factors specific to home loans.  452 Mass. 733, 748-50, 897 N.E.2d 548 (2008) (citing the Massachusetts Predatory Home Loan Practices Act, Mass. Gen. Laws ch. 183C; id. § 18(a) ("A violation of this chapter shall constitute a violation of chapter 93A.")).  The Supreme Judicial Court stated that those transactions violated chapter 93A because the "originating loans with terms that in combination would lead predictably to the consequence of the borrowers' default and foreclosure [were] within established concepts of unfairness at the time the loans were made." Fremont, 452 Mass. at 743.  Subsequent cases have clarified that the four factors the Fremont court considered are not the only method of evaluating loans that are doomed to fail but are instead indicia of a larger underwriting failure.  See Drakopoulos, 465 Mass. at 786 ("[T]he question is whether the

lender should have recognized at the outset that the plaintiffs were unlikely to be able to repay the loan.").

This case does not directly concern a home mortgage covered by the Massachusetts Predatory Home Loan Practices Act, but "even where the particular attributes of a loan are not subject to a specific prohibition, loans reflecting abusive practices nevertheless can involve unfair and deceptive conduct." Fremont, 452 Mass. at 744 n.19 (quoting Office of the Comptroller of the Currency, Guidelines for National Banks to Guard Against Predatory and Abusive Lending Practices, AL 2003-2, at 1 (Feb. 21, 2003)).  As in the home mortgage cases, the facts in this case concern a loan that has led to a notice of foreclosure on a home.  The doctrine from these home mortgage cases therefore serves as a "recognized or established common law or statutory concept of unfairness" relevant to this case. VMark Software, 37 Mass. App. Ct. at 620.

Here, a jury could reasonably infer that World Business should have foreseen an unacceptable probability of the loan's failure.  World Business targeted its marketing specifically at people with low credit scores who could not otherwise obtain a loan.  Compl. ¶ 24.  The information World Business gathered pursuant to the underwriting process consisted of New England Distributors' last six months of business bank statements, its last four months of merchant processing statements, and its

outstanding business debt.  Id. ¶¶ 25-31.  This may be
sufficient information for a normal business loan but is
arguably insufficient given the extraordinarily high interest
rate of the proposed loan.[5]  The Borrowers additionally submitted
a Business Loan Application that was missing key information,
including estimated monthly revenue, the number of employees,
and whether the business location was owned or rented.  Compl. ¶
36; Pls.' Opp'n, Ex. B, Business Loan Application, ECF No. 15-2.
After receiving these documents, World Business offered
Borrowers a 92% APR, nine-month loan secured by a house.  Compl.
¶¶ 27-33.  Notably, this loan of $175,000 was approximately
equivalent to the amount the Borrowers paid for their house,
minus existing loans at the time they submitted the loan
application.  Pls.' Opp'n, Ex. A, Uniform Residential Loan
Application 1, ECF No. 15-1.

---

[5] Lenders naturally charge higher interest rates to borrowers
without strong credit scores or a significant credit history,
and online lenders such as World Business often provide lending
to people that traditional banks will not conduct.
Nevertheless, the rate on the Kaur's loan is unusually high even
by the standards of online lenders.  A survey of the market by
LendingTree found only one of twenty-two online lenders to offer
maximum rates above 90% APR on business loans, and the rate of
92% is particularly notable here because it was secured against
the value of the Kaurs' home.  See ValuePenguin, Average Small
Business Loan Interest Rates in 2020: Comparing Top Lenders,
https://www.valuepenguin.com/average-small-business-loan-
interest-rates (last accessed Feb. 24, 2020).  Conventional
banks typically offer business loan rates up to 6% APR, though
online bankers offer maximum rates typically in the 20-70% APR
range.  Id.

As a result of these transactions, the Borrowers received a loan of value nearly equivalent to their equity in their home at an interest rate of 92% APR. To pay back such a loan, their business would have to be primed for significant growth. Surely a prudent lender would want to look very carefully at that business's books before extending such a loan with any confidence that it would be fully paid back. This may not have been the case here.

A jury could infer from the record that World Business was reckless in arranging the loan. Since the loan put the Borrower's home -- not just their business -- at risk, the Fremont line of cases is applicable here, and the Borrowers have stated a claim under chapter 93A.

## IV.  CONCLUSION

The motion to dismiss is ALLOWED in part and DENIED in part. The Borrowers have not alleged sufficient facts to survive a motion to dismiss on their usury claims (counts IV, V, and VI), as World Business notified the Massachusetts Attorney General of its intent to exceed the twenty percent per annum Massachusetts interest rate cap. The Borrowers also have not alleged a nexus between the deception alleged in count III and any separate cognizable injury.

The Borrowers have, however, alleged sufficient facts to permit the inference that the business loan may have been

"doomed to fail" as alleged in count II, and thus is an example of potentially unfair and deceptive business practices under Massachusetts General Laws chapter 93A, section 2(a).

The motion to dismiss is ALLOWED as to counts III, IV, V, and VI, and DENIED as to count II.


**SO ORDERED.**


_William G Young_
WILLIAM G. YOUNG
U.S. DISTRICT JUDGE